Shiloh Hernandez
Earthjustice
P.O. Box 4743
Bozeman, MT 59772-4743
(406) 586-9699
shernandez@earthjustice.org

Daniel Timmons, *pro hac vice pending*
Western Environmental Law Center
409 E. Palace Ave. #2
Santa Fe, NM  87501
(505) 570-7014
timmons@westernlaw.org

Melissa Hornbein
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
(406) 443-3501
hornbein@westernlaw.org

Brandon Jones-Cobb, *pro hac vice pending*
Center for Biological Diversity
P.O. Box 30604
Seattle, WA 98113-0604
(564) 397-0830, ext. 478
bjonescobb@biologicaldiversity.org

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MONTANA BILLINGS DIVISION

| | |
|---|---|
| MONTANA ENVIRONMENTAL INFORMATION CENTER, CENTER FOR BIOLOGICAL DIVERSITY, and WILDEARTH GUARDIANS,<br><br>          Plaintiffs,<br><br>   vs.<br><br>DOUG BURGUM, in his official capacity as Secretary of the Department of the Interior, U.S. OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT, an agency within the U.S. Department of the Interior; U.S. DEPARTMENT OF THE INTERIOR, a federal agency, MARCELO CALLE, in his official capacity as Acting Regional Director of U.S. Office of Surface Mining | Case No.  **CV-26-21-BLG-TJC**<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Reclamation and Enforcement
Western Region; and LANNY
ERDOS, in his official capacity as
Director of U.S. Office of Surface
Mining Reclamation and
Enforcement and acting Assistant
Secretary of Land and Minerals
Management of the U.S. Department
of the Interior,

                  Defendants.

## INTRODUCTION

1.      In the last decade, multiple tribunals, including this Court, have found the Amendment 3 (AM3) expansion of the Bull Mountains Mine unlawful. This is unsurprising, as initial federal studies predicted that the coal mine expansion would dewater the Bull Mountains, and multiple studies and data have subsequently confirmed that prediction.

2.      Since coal mining began at the Bull Mountains Mine, the ranching community in the Bull Mountains has been decimated. The mine operator, Signal Peak Energy, LLC, bought out multiple ranches above the mine and ended ranching on much of the rangeland above the mine.  In 2022, Signal Peak's Chief Executive Officer, Parker Phipps, wrote that the mining operation "is not compatible with cattle grazing operations" to explain its cancelation of a grazing lease and its intention to force a rancher off the rancher's own property (pursuant to a lease agreement). Ltr. from Parker Phipps, SPE (Nov. 14, 2022) (attached as Exhibit 1).

3.      The U.S. Office of Surface Mining Reclamation and Enforcement
(OSM) continued to sidestep environmental concerns when it approved of the federal
mining plan modification for the AM3 expansion on June 6, 2025. OSM rushed its
approval of the project, skipping preparation of a draft environmental impact
statement (EIS) and ignoring related public comments.

4.      The mine has a long history involving criminal and corrupt actions, and
it has devastated the ecology and ranching community of the Bull Mountains.
Nonetheless, OSM attempted to justify this rushed and reckless approval process in
the name of addressing a spurious "energy emergency" despite domestic fossil fuel
production occurring at near record levels, oversaturated fossil-fuel markets, the
declining relevance of coal, and approximately 99% of coal from the Bull Mountains
Mine being destined—not for domestic use—but for export.

5.      Since the 1990s, multiple experts, including experts from OSM and
state regulators, have repeatedly warned that the mine would dewater the Bull
Mountains aquifers. *See* Declaration of Keith Kirk (attached as Exhibit 2). Federal
Defendants continue to ignore these scientific conclusions in the EIS for the mine
expansion.

6.      Despite extensive and abiding concern about the environmental and
social impacts of the Bull Mountains Mine expansion, OSM issued this latest
approval to expand the mine without publishing a draft EIS and without accepting any

public input beyond comments submitted at the scoping stage—comments that OSM did not respond to.

7.      Relying on a supposed energy emergency that has no basis in reality, OSM's actions make a mockery of the required environmental review process.

8.      Plaintiffs respectfully urge this Court, for a fourth time, to protect the residents and ecology of the Bull Mountains and once again hold unlawful Federal Defendants' approval of the Bull Mountains Mine expansion.

## JURISDICTION AND VENUE

9.      This Court has federal question jurisdiction over this action, 28 U.S.C. § 1331, which arises under NEPA, 42 U.S.C. §§ 4321-4370h, and the APA, 5 U.S.C. §§ 701–706.

10.     The requested declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201, 2202, and 5 U.S.C. §§ 705, 706.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred in Montana and the property that is the subject of the action, the Bull Mountains Mine, is located in Montana. Venue is also proper under 28 U.S.C. § 1391(e)(1)(C) because officers of the United States are defendants, and Plaintiff Montana Environmental Information Center resides and operates in Montana.

12.     Venue is also proper in the Billings Division of this Court because the

Bull Mountains Mine is located in this division.

13.     Plaintiffs have standing under Article III of the U.S. Constitution because the challenged actions cause them economic, professional, recreational, and aesthetic harm, which will be remedied by a favorable ruling from this Court.

14.     The challenged actions are final and subject to judicial review under 5 U.S.C. §§ 702, 704, 706.

15.     Plaintiffs have exhausted any and all available and required administrative remedies.

## PARTIES

16.     Plaintiff Montana Environmental Information Center (MEIC) is a nonprofit organization founded in 1973 with approximately 10,000 members and supporters throughout the United States and the State of Montana. MEIC is dedicated to the preservation and enhancement of the natural resources and natural environment of Montana and to the gathering and disseminating of information concerning the protection and preservation of the human environment. MEIC works to educate its members and the general public concerning their rights and obligations under local, state, and federal environmental protection laws and regulations. MEIC is also dedicated to assuring that federal officials comply with and fully uphold the laws of the United States that are designed to protect the environment from pollution. MEIC and its members have intensive, long-standing recreational, aesthetic, scientific,

professional, and spiritual interests in the responsible production and use of energy, the reduction of greenhouse (GHG) pollution as a means to ameliorate our climate crisis, and the land, air, water, and communities impacted by climate change. MEIC members live, work, and recreate in areas that will be adversely impacted by the Bull Mountains Mine expansion. MEIC brings this action on its own behalf and on behalf of its adversely affected members.

17.     Plaintiff Center for Biological Diversity (the "Center") is a national, nonprofit conservation organization. In addition to its headquarters in Tucson, Arizona, the Center has offices, staff, and members around the country, including an office in Missoula, Montana. The Center has over 94,000 members nationwide, including approximately 540 members who live in the State of Montana. The Center is dedicated to the preservation, protection, and restoration of biodiversity, native species, and ecosystems. Since its founding over thirty years ago, the Center has fulfilled its mission by preparing and publishing scientific articles, participating in state and federal administrative proceedings, disseminating educational information through newsletters, alerts, the world-wide web and media releases, and litigating to protect species and their habitats. The Center's members that reside, work, or recreate in Montana have particularized interests in protecting the state's public lands, waterways, and air from the harmful effects of coal mining and would be harmed by the Bull Mountains Mine expansion. The Center brings this action on its own behalf

and on behalf of its adversely affected members.

18.    Plaintiff WildEarth Guardians (Guardians) is a nonprofit conservation organization with approximately 180,000 members and activists throughout the United States, including nearly 1,250 in Montana. Guardians has a major office in Missoula, Montana. Guardians' mission is to protect and restore the wildlife, wild rivers, wild places, and health of the American West. Through its Climate and Energy Program, Guardians is dedicated to protecting the American West from the dangers it faces from the climate crisis. Guardians' members and staff have recreational, aesthetic, scientific, professional, and spiritual interests in a protected and stable climate, and an environment that is sustained by a protected and stable climate. Guardians' members use and plan to continue to live in, use, and enjoy landscapes impacted by the Bull Mountains Mine.

19.    Plaintiffs' members are injured by OSM's approval of the mine expansion. Tom Baratta is a member of CBD, MEIC, and Guardians. Mr. Baratta lives in the Bull Mountains in close proximity to the mine area. He has witnessed springs in the area dewatered coincident to mining and worries that his groundwater will similarly be harmed. He is also worried about particulate pollution blowing off the mine's enormous coal waste pile just upwind of his property will harm his health.

20.    Pat Thiele is a member of CBD and MEIC and lives in the Bull Mountains in close proximity to the mine area. He is concerned about the subsidence

6

fractures in the Bull Mountains, which threaten volunteer firefighters in the area, like himself. He also worries about the impacts on wildlife population in the Bull Mountains. He regularly viewed wildlife, such as elk, before the Bull Mountains Mine began operating, but now he does not see elk at all. Mr. Theile worries that the mine's industrial surface facilities, including its massive waste disposal area, are displacing wildlife from the Bull Mountains.

21.     James Jensen is a member of CBD and MEIC. He lives in Helena, Montana, but has been regularly visiting the Bull Mountains for decades. Mr. Jensen plans to continue to visit the Bull Mountains for the foreseeable future. Mr. Jensen enjoys the beauty and vistas available in the Bull Mountains. He is worried about the Bull Mountains Mine's impacts to water resources in the area. He knows the area's ecology is dependent on scarce ground and surface water sources. He knows that the mine is dewatering the Bull Mountains at a prodigious rate and worries that continued dewatering will devastate the area's ecology. He has viewed the mine's subsidence fractures and finds them unpleasant to view. Mr. Jensen will likely reduce his visits to the Bull Mountains if the mine expansion proceeds because he cannot bear to see the landscape destroyed.

22.     Defendant U.S. Department of the Interior ("Interior" or "DOI") is a federal department responsible for implementing and complying with federal laws, including NEPA, governing approval of mining plan modifications.

23.    Defendant U.S. Office of Surface Mining Reclamation and Enforcement ("OSM") is a federal agency within the U.S. Department of the Interior that is responsible for assuring lawful environmental review of mining plan modifications under NEPA and recommending approval, conditional approval, or disapproval of applications for mining plan modifications. OSM conducted the environmental review of the mining plan modification for the expansion of the Bull Mountains Mine, concluding that the expansion would not significantly affect the environment.

24.    Defendant Marcello Calle is the Acting Regional Director of the U.S. Office of Surface Mining Reclamation and Enforcement Western Region. Mr. Calle is responsible for managing federal coal resources, including those involved in this action, and for making recommendations to the Secretary of the Interior regarding applications for mining plan modifications. Mr. Calle is also responsible for implementing and complying with NEPA and other federal laws governing review and recommendations for approval, conditional approval, or disapproval of applications for mining plan modifications. Mr. Calle approved the record of decision and recommended approval of the mining plan modification for the Bull Mountains Mine expansion.

25.    Defendant Lanny Erdos is the Director of OSM and has been the acting Assistant Secretary of Land and Minerals Management of the U.S. Department of the

Interior since December 2025. In those capacities, Mr. Erdos is responsible for: complying with federal laws governing approval, conditional approval, or disapproval of applications for mining plan modifications; approving or disapproving of applications requesting use of the Department of Interior's alternative emergency arrangements for NEPA compliance; and assuring that OSM complies with federal laws, including NEPA and other laws governing review and recommendations for approval, conditional approval, or disapproval of applications for mining plan modifications.

26.    Defendant Doug Burgum is Secretary of the U.S. Department of the Interior. Mr. Burgum is responsible for implementing and complying with federal laws governing mining plan modifications, including NEPA.

## STATUTORY BACKGROUND

### *The Administrative Procedure Act*

27.    The APA, which applies to all federal agencies, provides the general procedures for federal decisions, and it provides for judicial review of those actions. *See* 5 U.S.C. § 551 *et seq.*

28.    An "agency" means "each authority of the Government of the United States, whether or not it is within or subject to review by another agency." 5 U.S.C. §§ 551(1) and 701(b)(1).

29.    The APA allows persons and organizations to challenge final agency

actions in the federal courts. 5 U.S.C. §§ 702 and 704.

30.    The APA declares that a court shall hold unlawful and set aside agency

actions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law; or, without observance of procedure required by law. 5 U.S.C.

§ 706(2)(A), (D).

*The National Environmental Policy Act*

31.    On January 1, 1970, President Nixon signed into law the National

Environmental Policy Act of 1969. Pub. L. No. 91-190, 83 Stat. 852 (1970).

32.    NEPA declares a national policy "to encourage productive and

enjoyable harmony between [humans] and [the] environment" and "to promote efforts

which will prevent or eliminate damage to the environment and biosphere." 42 U.S.C.

§ 4321.

33.    NEPA's "twin aims" are to ensure federal agencies "consider every

significant aspect of the environmental impacts of a proposed action" and "inform the

public that it has indeed considered environmental concerns in its decisionmaking

process." *Balt. Gas & Elec Co. v. NRDC*, 462 U.S. 87, 97 (1983). Accordingly,

NEPA establishes "a set of 'action-forcing' procedures that require that agencies take

a 'hard look' at environmental consequences." *Robertson v. Methow Valley Citizens*

*Council*, 490 U.S. 332, 351 (1989) (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 410

n.21 (1976)).

34.     Specifically, agencies must prepare a "detailed" EIS when they propose to take "major federal actions significantly affecting the quality of the human environment," 42 U.S.C. § 4332(2)(c), if those significant effects are "reasonably foreseeable," *id*. § 4336(b)(1). Among other things, the EIS must analyze the "reasonably foreseeable environmental effects of the proposed agency action," including "adverse" effects that "cannot be avoided should the proposal be implemented"; "a reasonable range of alternatives to the proposed agency action"; "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity"; and "any irreversible and irretrievable commitments of Federal resources which would be involved in the proposed agency action should it be implemented." 42 U.S.C. § 4332(2)(C)(i)–(v).

35.     The EIS must also discuss "steps that can be taken to mitigate adverse environmental consequences." *Robertson*, 427 U.S. at 351. Agencies "shall … ensure the professional integrity, including scientific integrity, of the discussion and analysis" in an EIS. 42 U.S.C. § 4332(2)(D).

36.     The EIS "ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson*, 490 U.S. at 349.

11

37. As an alternative to the more-robust EIS process, an agency may also prepare an Environmental Assessment (EA) if it can demonstrate that the action's effects are insignificant.

38. Although Congress granted agencies some flexibility in implementing NEPA, it also directed that agencies use "all practicable means" in cooperation with the public to fulfill NEPA's objectives:

> It is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.

42 U.S.C. § 4331(a); *see also id* § 4331(b) (establishing the Federal Government's "continuing responsibility" to "use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may … fulfill the responsibilities of each generation as trustee of the environment for succeeding generations," among other objectives. *Id*. § 4331(b) (emphasis added).

39. Accordingly, Congress directed that agencies, "to *the fullest extent possible* ... shall ... identify and develop methods and procedures, in consultation with the Council on Environmental Quality … which will ensure that presently unquantified environmental amenities and values may be given appropriate

consideration in decisionmaking along with economic and technical considerations."

*Id.* § 4332(2)(B) (emphasis added); *see* section B, *infra* (detailing those procedures,

including CEQ and Interior regulations).

40.     NEPA further mandates that national laws and policies be construed to

further NEPA's goals of environmental protection: "The Congress authorizes and

directs that, *to the fullest extent possibl*e: … the policies, regulations, and public laws

of the United States shall be interpreted and administered in accordance with the

policies set forth in this chapter [NEPA]." 42 U.S.C. § 4332(1).

41.     NEPA established the Council on Environmental Quality (CEQ) in the

Executive Office of the President. 42 U.S.C. § 4342. CEQ is a three-member council,

whose members are appointed by the President. *Id*.

42.     Two months after NEPA's enactment, President Nixon issued an

Executive Order directing agencies to develop procedures for public involvement to

carry out NEPA's environmental objectives:

> Consonant with Title I of the National Environmental Policy Act of 1969
> …, the heads of Federal agencies shall … [d]evelop procedures to ensure
> the *fullest practicable provision of timely public information and
> understanding of Federal plans and programs with environmental impact
> in order to obtain the views of interested parties*. These procedures shall
> include, whenever appropriate, provision for public hearings, and *shall
> provide the public with relevant information*, *including information on
> alternative courses of action.*

Executive Order 11514, *Protection and Enhancement of Environmental Quality*, 35

Fed. Reg. 4247, § 2(b) (Mar. 5, 1970) (emphasis added).

43.     Executive Order 11514 remains in effect today.

*Regulations Implementing NEPA*

44.     In 1978, CEQ promulgated regulations implementing NEPA. 43 Fed.
Reg. 55978 (Nov. 29, 1978). CEQ's rulemaking aimed "to produce better decisions
which further the national policy to protect and enhance the quality of the human
environment." *Id*.

45.     Among other things, CEQ's regulations recognized that "public
scrutiny [is] essential to implementing NEPA." 40 C.F.R. 1500.1(b) (1978). CEQ set
forth a policy to "[e]ncourage and facilitate public involvement in decisions which
affect the quality of the human environment," *id*. § 1500.2(d).

46.     Accordingly, the CEQ regulations, from their adoption in 1978 and
through multiple recent amendments, have consistently required public comment on
draft EISs. 40 C.F.R. § 1503.1(a)(4) (1978); 40 C.F.R. § 1503.1(a)(2)(v) (2020); 40
C.F.R. § 1503.1(a)(2)(v) (2022); 40 C.F.R. § 1503.1(a)(2)(v) (2024).

47.     Interior promulgated NEPA regulations, which have been codified since
2008. *See* 73 Fed. Reg. 61292 (Oct. 15, 2008). In adopting these regulations, Interior
stated they would be used "in conjunction with and supplementary to" NEPA, CEQ's
regulations, and Executive Order 11514. *Id*. The purpose of the regulatory
codification was to "highlight opportunities for public engagement and input in the
NEPA process," thereby "allow[ing] the public to more easily participate in the

NEPA process." *Id*. at 61292–93.

48.     With respect to EISs, Interior's 2008 rulemaking required that: "A bureau must seek comment from the public as part of the … notice of availability for a draft environmental impact statement," 43 C.F.R. § 46.435(a), and "must request comments from … persons or organizations who may be interested or affected," among other entities, *id*. § 46.435(b)(4). This requirement incorporates by reference CEQ's parallel requirements that a draft EIS should be circulated for public comment, 40 C.F.R. § 1503.1(a)(4); *see also* 43 C.F.R. 46.20(a) ("This part supplements, and is to be used in conjunction with, the CEQ regulations except where it is inconsistent with other statutory requirements.").

49.     Interior's rules also allow it to adopt "alternative arrangements" that allow deviations from its NEPA regulations during emergencies. This provision applies only if the designated Interior Responsible Official "determines that an emergency exists that makes it necessary to take urgently needed actions before preparing an environmental document or documenting its use of a categorical exclusion." 43 C.F.R. § 46.150 (2008) (version in effect at time of approval); *see also* 90 Fed. Reg. 29498, 29501 (July 3, 2025) (making purportedly "minor clarifying adjustments" that "do not change the meaning of the provisions").

50.     The authority is highly circumscribed, applying only to "those actions necessary to control the immediate impacts of the emergency that are urgently needed

to address imminent threats to life, property, or important natural, cultural, or historic

resources." *Id.* § 46.150(a). In these limited circumstances, the Responsible Official

must "consider the probable environmental consequences of these actions [taken in

response to an emergency] and mitigate reasonably foreseeable adverse

environmental effects to the extent practicable." *Id.*

51.    The regulations further require the Responsible Official to "document

in writing the determination that an emergency exists and describe the responsive

actions taken at the time the emergency [i.e., urgently needed actions to mitigate harm

to life, property, or important natural, cultural, or historic resources] exists." *Id.* §

46.150(a)–(b).

52.    If further emergency actions are required and preclude preparation of an

environmental document, the Responsible Official must "consult with [Interior's]

Office of Environmental Policy and Compliance about alternative arrangements for

NEPA compliance." *Id.* § 46.150(c).

53.    The "alternative arrangements shall apply only to the proposed actions

necessary to control the immediate actions in response and related to the emergency

… and must be documented." *Id.*

54.    Although the regulations provide no definition for the term

"emergency," Interior's contemporaneous understanding at the time of its enactment

was that it should be limited to "a sudden, urgent, usually unexpected occurrence or

occasion requiring immediate action," and that it authorized "immediate actions to control the immediate impacts of an emergency to mitigate harm to life, property, or natural or cultural resources." 73 Fed. Reg. 61,292, 61,301 (Oct. 15, 2008).

55.     Thus, alternative NEPA arrangements for emergency response apply in "narrow" circumstances that involve "sudden, unanticipated events, not the unfavorable consequences of protracted litigation." *NRDC v. Winter*, 527 F. Supp. 2d 1216, 1229 (C.D. Cal. 2008).

56.     BLM's NEPA Handbook offers additional examples of typical emergencies, which include hazardous waste spills, ongoing wildland fires, and emergency actions that are immediately necessary to protect public health and safety or important resources following wildland fires or other natural disasters.

57.     Earlier this year, CEQ rescinded its NEPA regulations, including the regulations intended to supplement Interior's own NEPA regulations. *See* 90 Fed. Reg. 10610 (Feb. 25, 2025).

58.     CEQ also issued guidance directing all federal agencies to "continue to follow their existing practices and procedures for implementing NEPA," and also "consider voluntarily relying on those [CEQ's] regulations in completing ongoing NEPA reviews[.]" Memorandum for Heads of Federal Departments and Agencies, on "Implementation of the National Environmental Policy Act," from Katherine R. Scarlett, Council on Env't Quality 1 (Feb. 19, 2025).

## FACTUAL BACKGROUND

*Coal Mining in the Bull Mountains*

59.    The Bull Mountains range forms the hydrologic divide between the Musselshell River to the north and the Yellowstone River to the south. From the Summit of the highest point—Dunn Mountain—it is possible to view the Big and Little Snowy Mountains, the Crazy Mountains, and the Beartooth Mountains to the west, and the Pryor Mountains and Big Horn Mountains to the south.

60.    The Bull Mountains are known as a sacred area to the Crow and other Tribes, and many indigenous Tribes, including the Crow, Blackfeet, Sioux, Northern Cheyenne, Assiniboine, Gros Ventre, Shoshone, and Arapaho, have ancestral ties to the mountains.

61.    For generations, the Bull Mountains—a groundwater-dependent ecosystem in central Montana—have been home to sustainable family ranching operations that are wholly dependent on the handful of wells and springs dispersed throughout the range.

62.    Coal mining has occurred sporadically in the Bull Mountains for over a century. Historical coal mining the Bull Mountains was typically small-scale underground room and pillar mining operations. The operations typically followed a boom-bust pattern, with economic good times followed by downturns.

63.    What is now the Bull Mountains Mine was initially proposed in the

1980s. Montana state regulators approved the operation in 1993. An early cutting-edge study by hydrologists with OSM concluded that the proposed long-wall mining would cause "adverse and irreversible effects on the hydrologic system and water supply [that] could not be mitigated if mining were to take place." Declaration of Keith Kirk. This study subsequently appears to have disappeared from the files of OSM and the State of Montana.

64.    Montana state regulators similarly expressed skepticism about whether lands in the Bull Mountains could be successfully reclaimed after longwall mining.

65.    Despite the state approval in 1993, coal mining did not occur immediately, and the mine was transferred to various corporate entities over the next 15 years.

66.    In 2008, Signal Peak Energy, LLP (Signal Peak) obtained the right to extract coal at Bull Mountains Mine. Today, this mine is a massive underground, longwall mining operation, located south of the Musselshell River and the town of Roundup, Montana.

67.    For at least the period that the mine has been operated by Signal Peak, the majority of coal produced at the mine has been exported, principally to Japan and South Korea.

68.    The structure of underground mining at Bull Mountains Mine allows the mine roof to collapse or subside as the mining process advances. The subsidence

causes splitting and depression of the surface land above the mining operation. Cave-ins and land subsidence from Bull Mountains Mine can – and do – fracture perched aquifers and cause springs and wells to go dry, as predicted by OSM's early hydrology analysis. In fact, a significant number of springs undermined by the Bull Mountains Mine have already been dewatered or contaminated, which harms Plaintiffs' members' interests.

69.     Signal Peak began large scale coal mining operations at the Bull Mountains Mine in 2008.

70.     In 2022, Signal Peak pled guilty to lying to mine safety authorities to hide workplace accidents, where it had "habitually violated" worker and environmental safety standards with the "full knowledge, discretion, and participation of the most senior management of the mine, including the President and CEO." Offer of Proof at 3, *United States v. Signal Peak Energy*, No. CR 21-79 (D. Mont. Oct. 5, 2021).

71.     Signal Peak's conviction was at the center of other alleged wrongdoing, ranging from embezzlement and money laundering to drug and gun charges, prompting the U.S. Attorney's Office to describe the mine as a "den of thievery." Phoebe Tollefson, *Prosecutor Calls Signal Peak Mine "a Den of Thievery" as 1st Man Sentenced in Connection with Ex-mine Exec Fraud*, Billings Gazette (Oct. 29, 2019); *see also* AP, *Mont. Coal Mine Fined $1M for Violating Safety Regulations*,

Greenwire (Feb. 2, 2022) (noting that "[t]he prosecution of the mine was part of a broad corruption investigation into mine management and operations that led to convictions of former mine officials and associates for embezzlement, tax evasion, bank fraud, money laundering, drug trafficking and firearms violations, officials said"); U.S. Dept. of Interior Office of Inspector General, *Summary: Company Reported False Invoices and Information to ONRR to Reduce Royalty Obligations* (Dec. 18, 2025) (noting Signal Peak's $200,000 settlement with the government under the False Claims Act related to falsified invoices it submitted to reduce coal royalty obligations).

72.    Signal Peak's owners, FirstEnergy Corp. and Gunvor Group, have also recently paid criminal fines of hundreds of millions of dollars for unrelated charges of bribery to obtain access to fossil fuel markets and subsidies. Deferred Prosecution Agreement at 4 & attach. A, *United States v. FirstEnergy Corp.,* No. CR 21-86 (S.D. Ohio July 22, 2021) ($230 million fine); Judgment at 1–3, *United States v. Gunvor, S.A.*, No. CR 24-85 (E.D.N.Y. Apr. 3, 2024) ($374 million fine for conspiracy to violate Foreign Corrupt Practices Act); Julia Payne, *Gunvor Must Pay $95 Million for Congo Oil Corruption: Swiss Prosecutors*, Reuters (Oct. 17, 2019); *see also* Nathanael Johnson, *How a $60 Million Bribery Scandal Helped Ohio Pass the "Worst Energy Policy in the Country,"* Grist (Jan. 26, 2022) (detailing FirstEnergy bribery scandal behind legislation that subsidized coal and nuclear plants in Ohio).

73.     In November 2025, the U.S. Treasury Department stated that Gunvor

"will never get a license to operate or profit" due to its alleged ties to Russia. AP,

*Trading Firm Gunvor, Accused by US of Being 'Kremlins Puppet,' Drops Plan to Buy*

*Lukoil Assets*, (Nov. 7, 2025).

74.     Further, while Signal Peak has touted its value to the community, it has

devastated the once-sustainable ranching community in Bull Mountains through

dewatering and destroying spring and wells, causing ranchers to sell out or leave.

75.     While the land above the Bull Mountains Mine was once used

predominantly for cattle grazing, Signal Peak recently stated that it has bought out

ranches and ended grazing on large amounts of land above the mine.

76.     Signal Peak also has a history of violating environmental protection

standards, especially those for monitoring and assessing impacts to water.

*Mining's Impacts to Water*

77.     Agriculture provides the economic base for the region around the Bull

Mountains and is wholly dependent on water. High quality water in the region is,

however, scarce and therefore extremely important.

78.     The region of the Bull Mountains overlying the Bull Mountains Mine

contains scattered intermittent and perennial streams and wetlands fed in part by

groundwater.

79.     The Musselshell River, to which much of the mine area drains, is closed

to new surface water appropriations during summer months.

80.    Wetlands are extremely rare in the Bull Mountains, accounting for less than 0.1 percent of the area. Those that exist play an ecologically critical role in the area by providing drinking water for wildlife, habitat for aquatic and semi-aquatic life, and rich plant communities that provide critical forage and habitat for wildlife.

81.    The long-wall mining method used by Signal Peak at the Bull Mountains Mine and proposed for the mine expansion results in subsidence or collapse of the land above the mine.

82.    Subsidence can impact ground and surface water above the mine area by draining and dewatering spring-fed intermittent and perennial streams and associated wetlands.

83.    To date, many springs that have been undermined in the Bull Mountains have suffered impacts to water quality and/or water quantity.

84.    Signal Peak and regulators have recently argued that a sandstone aquifer beneath the mine, known as the "deep underburden aquifer" or "deep aquifer" is a viable source of replacement water for dewatered springs and wells.

85.    It is doubtful, however, that the deep aquifer has enough high-quality water that is physically and legally available to replace impacted water sources.

86.    Median sodium levels in the deep aquifer exceed the upper limits for sodium in livestock watering guidelines used by the State of Montana.

87.     Neither state regulators nor Federal Defendants assessed whether water in the deep aquifer was legally available to be used to mitigate impacts to water resources from the mine.

88.     Published geological reports of the geology of the Bull Mountains have concluded that the sandstone aquifers are not continuous, but lenticular and cannot be traced over large areas of the subsurface of the Bull Mountains.

89.     Sandstone layers in the Bull Mountains were formed from alluvial channels, which did not create extensive layers.

90.     The only empirical evaluation of the capacity of the deep aquifer to supply water for mitigation recorded significant levels of aquifer drawdown after only modest pumping for a short period of time.

91.     Multiple hydrologists have raised doubts about the ability of the deep aquifer to provide sufficient water to replace springs and wells threatened by the Bull Mountains Mine.

92.     One expert, Payton Gardner, Ph.D., simulated the capacity of the deep aquifer to provide replacement water and concluded that it is highly doubtful that the deep aquifer has sufficient capacity to meet potential mitigation needs and has not been adequately evaluated. Dr. Gardner's study found the mine was dewatering the Bull Mountains at a significant rate (nearly 1,000 gallons per minute, or gpm), but that the deep aquifer could not support sustained withdrawals of even 6 gpm for

mitigation.

93.    Counsel for Plaintiffs submitted the Gardner study to OSM shortly after it was completed and well in advance of OSM's issuance of the EIS.

94.    Even Signal Peak's own expert witness and hired consultant, Michael Nicklin, Ph.D., has testified that the available evidence is insufficient to demonstrate that the company can replace 100 gpm of water. Recent investigations by Dr. Nicklin show that the mine is dewatering the Bull Mountains at a rate of approximately 1,000 gpm.

95.    OSM's own initial groundwater modeling showed that the mine would irreversibly dewater the Bull Mountains and that the impacts could not be mitigated *See* Declaration of Keith Kirk. The prior modeling report has apparently been "misplaced" by both OSM and the Montana Department of Environmental Quality, and the underlying data has been lost. *Id.* In 2016, the Montana Board of Environmental Review held that state regulators and Signal Peak had failed to demonstrate that the mine can replace water resources threatened by the mine. *In re Bull Mountains*, No. BER 2013-07 SM at 87 (Mont. Bd. of Env't Rev. Jan. 14, 2016) (holding that permit record "demonstrated only that the mine expansion, as currently designed, may or may not cause material damage outside the permit area in the next 50 years and that there may or may not be water resources available for mitigation").

*The Amendment 3 (AM3) Expansion of the Bull Mountains Mine*

96.     In 2015, OSM finalized an environmental assessment, finding of no

significant impact, and approval for a modification to expand Signal Peak's mining

plan at Bull Mountains Mine.

97.     In 2017, this Court found that OSM's NEPA analysis was inadequate,

vacating the 2015 environmental assessment and enjoining mining in the expanded

mine area. *Mont. Env't Info. Ctr. v. U.S. Office of Surface Mining*, 274 F. Supp. 3d

1074 (D. Mont. 2017). This Court later narrowed the injunction to allow limited

mining during remand. *Mont. Env't Info. Ctr. v. U.S. Office of Surface Mining*, No.

CV-15-106, 2017 WL 5047901, at *6 (Nov. 3, 2017).

98.     OSM finalized a revised environmental assessment in 2018 and again

approved the Bull Mountains Mine expansion.

99.     In 2020, this Court again found that OSM's revised NEPA analysis for

the mine expansion was inadequate. *350 Mont. v. Bernhardt*, 443 F. Supp. 3d 1185

(D. Mont. 2020).

100.    On appeal, the Ninth Circuit agreed, and found that the government had

violated NEPA "by failing to provide a convincing statement of reasons why the

project's impacts are insignificant." *350 Mont. v. Haaland*, 50 F.4th 1254, 1259 (9th

Cir. 2022) (quotes, citations, and brackets removed). "[V]acatur," the Ninth Circuit

said, is "[t]he presumptive remedy for violations of NEPA and the Administrative

Procedure Act." *Id.*

101.    Subsequently, OSM unilaterally determined, "for the first time after repeated Mine Expansion approvals based on invalid EAs," that an EIS was warranted. *350 Mont. v. Haaland*, No. CV 19-12, 2023 WL 1927307, at *3 (D. Mont. Feb. 10, 2023).

102.    This Court then issued its opinion on remand from the Ninth Circuit on the issue of remedy, noting that the government's "errors cast substantial doubt on the agency's decision to approve the Mine Expansion in the first instance. That doubt is then augmented, not assuaged, by the agency's unilateral decision to prepare an EIS at this late stage of the proceedings." *Id.* at *3.

103.    The Court further found that Signal Peak's mining operations were harming water resources and ranchers: "Signal Peak's subsi[d]ence mining has harmed local ranching interests by creating fissures in the ranchland. Additionally, Signal Peak's mining operation causes damage to local ranchers' water resources, including in one instance, damaging working water wells. Local ranchers fear that Signal Peak's longwalls have already caused potentially irreversible damage to ranching in the Bull Mountains." *Id.* at *5 (internal citations omitted).

104.    Ultimately, this Court found that vacatur was warranted.

105.    In August 2023, OSM published a notice of intent to prepare an EIS and subsequently announced the draft EIS would be available for comment in Spring

2024. 88 Fed. Reg. 52205 (Aug. 7, 2023).

106.    OSM accepted scoping comments in 2023 and 2024. MEIC and other conservation groups submitted extensive comments.

107.    When the environmental review process did not proceed fast enough for Signal Peak, the company sued OSM to curtail the process. *Signal Peak Energy, LLC v. Haaland*, No. 24-CV-366, 2024 WL 3887386 (D.D.C. Aug. 21, 2024). In August 2024, the U.S. District Court for the District of Columbia dismissed Signal Peak's baseless challenge. *Id.* at *10.

108.    OSM subsequently revised its schedule to complete the environmental review process, proposing to issue a draft EIS in the spring of 2025, accept public comment, and then issue a final EIS in the fall of 2025.

*The Administration's Fabricated "Energy Emergency"*

109.    On January 20, 2025, President Trump issued Executive Order (EO) 14,156, "Declaring a National Energy Emergency." 90 Fed. Reg. 8433 (Jan. 20, 2025). This Order alleged that "precariously inadequate and intermittent energy supply, and an increasingly unreliable grid" pose threats to the military, economy, and working Americans. Exec. Order 14,156, § 1. "An affordable and reliable domestic supply of energy is a fundamental requirement for the national and economic security of any nation." *Id.* The basis of the supposed emergency is that "energy" production in the United States is "too inadequate to meet our Nation's needs." *Id.*

110.    The purported energy emergency declared by Exec. Order 14,156, on which the Alternative NEPA Arrangements rely, is fictitious and pretextual.

111.    Simply put, there is no truth in the assertion that the United States is not producing enough energy to meet its domestic needs. In fact, the opposite is true: the nation has more energy than it needs and is exporting large amounts.

112.    There is no evidence of a near-term global supply shortage of coal that will impact Japan or South Korea. In fact, Japan and South Korea are predicted to undergo a long-term transition to cheaper and less carbon intensive energy sources, like natural gas and renewable energy. This trend is predicted to occur across much of the globe, leading to continued declines in global coal demand, including reduced demand for thermal coal exports from the United States.

113.    The United States also produces more oil and gas than it needs. Thus, in 2024, United States exports of crude oil reached record levels of 4.1 million barrels per day.

114.    That same year, the United States was the world's largest gas exporter, exporting 11.9 billion cubic feet per day, which was nearly a record for national exports.

115.    Coal exports from the United States also increased in 2024 and nearly reached historical records, as the nation exported 107 million short tons of coal.

116.    Since 2024, this reality has not changed. The most recent energy

outlook projects that a growing global glut of oil will cause significant declines in oil and gasoline prices. The projected decline in oil prices is not expected to cause any decrease in U.S. oil production in 2026.

117.    As the U.S. Department of Energy recently found, domestic natural gas prices in the United States are projected to increase because of increased and record liquified natural gas exports, suggesting that "dramatically increasing [natural gas] exports [will] generate wealth for the owners of export facilities and create jobs across the natural gas supply chain," but will "increase wholesale domestic natural gas prices by over 30%."

118.    There is certainly no evidence of a domestic coal shortage, necessitating emergency action. Domestically, coal production is projected to fall. In 2025, coal provided approximately 15% of domestic electricity production in the United States, down from 50% in 2007. Exports of thermal coal (like the coal from the Bull Mountains) are expected to decline because of a persistent oversupply and lower coal prices.

119.    In short, domestic fossil fuel production is projected to fall because of *excessive*—not inadequate—supplies.

120.    Although there is an expected modest increase of 1–3% in domestic electricity demand in 2026, the fastest growing sources of electricity production are renewables, especially solar and battery storage. Indeed, the U.S. Department of

Energy has acknowledged that "[t]he rise of renewable power, which comes from unlimited energy resources, like wind, sunlight, water, and the Earth's natural heat, has the potential to vastly improve the reliability of the American energy system."

121.    Not only are these sources of energy excluded from Exec. Order 14,156, but the Administration has actively suppressed their development. *See* Presidential Memorandum on Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects (Jan. 20, 2025) (vacated on Dec. 15, 2025); Interior Order No. 3438 (Aug. 1, 2025) (deeming wind and solar energy "highly inefficient" projects that "may unnecessarily and unduly degrade Federal lands").

122.    As clearly demonstrated by the Administration's actions, there is no urgent domestic energy emergency in the United States, immediately threatening life, property, or resources. The opposite is true: energy markets are oversupplied, which is expected to result in reduced prices for oil and coal for the foreseeable future. The United States is currently exporting near record amounts of oil, and coal exports are only limited by low prices caused by the combination of oversupplied markets and cheaper energy alternatives. The U.S. has more fossil fuels than it needs. Moreover, even if there were a domestic energy emergency and energy production was "inadequate to meet our Nation's needs," Exec. Order 14,156, § 1, *exporting* coal

from the Bull Mountains Mine would not ameliorate the problem—it would exacerbate it.

123.     Even assuming there was a need for increased domestic production of energy—which there is not—the Executive Branch lacks both Constitutional and statutory authority to commandeer the U.S. energy sector in an effort to prioritize its favored energy sources while obstructing others. Nor can the President usurp Congress' authority by fabricating exemptions from NEPA and other lawfully-enacted statutes to effectuate those goals.

*Interior's Alternative NEPA Arrangements*

124.     To address the supposed emergency, Exec. Order 14,156 directed agencies to take action under various laws to expedite fossil-fuel-related projects. The emergency declaration does not point to any Congressionally-authorized emergency authority under NEPA, nor are Plaintiffs aware of any such authority.

125.     Nonetheless, pursuant to the Executive Order and its "Emergency Responses" regulation at 43 C.F.R. § 46.150, Interior adopted "Alternative Arrangements for NEPA Compliance" on April 23, 2025 (hereinafter "Alternative NEPA Arrangements"). The Alternative NEPA Arrangements responded to the direction in Exec. Order 14,156 to "identify and exercise any lawful emergency authorities available to them … to facilitate the identification, leasing, siting, production, transportation, refining, and generation of domestic energy resources."

126.    Both the Council on Environmental Quality and Department of Interior authorized use of these provisions for projects that fall under the umbrella of the purported national energy emergency.

127.    When applied to eligible "energy-related projects," the Alternative NEPA Arrangements authorized Interior officials to forego the normal NEPA process required under Interior's regulations, such as publishing a draft EIS and soliciting comment on it.

128.    Consistent with Exec. Order 14,156, but inconsistent with the existence of any true energy emergency, the Alternative NEPA Arrangements only apply to non-renewable energy projects.

129.    Applicants must request application of the Alternative NEPA Arrangements. If Interior approves application of the Alternative Arrangements, the NEPA process is significantly curtailed, with no need to publish a draft EIS or solicit public comment on it, and a limited public comment period of approximately ten days required during the scoping stage.

130.    In approving an application of the Alternative NEPA Arrangements, Interior must show how the proposed action addresses the national energy emergency.

*OSM's 2025 Approval of the Bull Mountains Mine Expansion*

131.    After this Court determined in 2023 that vacatur was warranted where Federal Defendants failed to adequately evaluate the environmental impacts of the

proposed mine expansion, OSM conducted another deficient NEPA analysis on remand.

132.    On May 6, 2025, Signal Peak requested emergency approval of the expansion, pursuant to the Alternative NEPA Arrangements.

133.    On May 12, 2025, Interior's acting Assistant Secretary of Land and Minerals approved application of Alternative NEPA Arrangements for the Bull Mountains Mine expansion.

134.    Walking back earlier commitments to publish a draft EIS and offer an opportunity for public comment, OSM instead issued a final EIS and record of decision for the Bull Mountains Mine expansion on June 6, 2025. It did not accept any comments on its EIS and it did not respond to any of the prior comments submitted by conservation groups during earlier scoping periods.

135.    In approving the expansion, OSM anticipated that nearly all the coal produced at Bull Mountains Mine would be exported to Japan, Korea, Chile, and Hong Kong (China).

136.    There is no guarantee that Signal Peak will ship coal from the Bull Mountains Mine to Japan or Korea. The EIS acknowledges that Signal Peak's sales are typically spot sales or short-term contracts, not long-term contracts. The EIS further acknowledges that nearly 5% of Signal Peak's coal is shipped to Hong Kong (a special administrative region of China), undercutting OSM's assertion that mine

expansion will strengthen the United States' relationship with Japan and South Korea and "make them more resilient in deterring aggression by China in the Indo-Pacific." Signal Peak has no commitment to selling coal to Japan and South Korea, will sell to the highest bidder, and is free to continue to sell coal to Hong Kong, even if that coal is inevitably destined for mainland China.

137.    According to a consultant hired by Signal Peak Energy (Timothy Considine), coal from the Bull Mountains is insignificant to the East Asian coal market, constituting only 0.07% of the enormous market.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

## (NEPA and APA Violation: Alternative NEPA Arrangements Are Unlawful As Applied to the Mine Expansion)

138.    Plaintiffs incorporate by reference all preceding paragraphs.

139.    OSM and Interior are "agenc[ies]" as defined in 5 U.S.C. § 551(1).

140.    On May 12, 2025, Interior approved application of the Alternative NEPA Arrangements to the Bull Mountains Mine Expansion.

141.    On June 6, 2025, Interior issued a final EIS and record of decision approving the Bull Mountains Mine expansion.

142.    Neither Interior's May 12, 2025 nor its June 6, 2025 actions were "necessary to control the immediate impacts" of a valid emergency, as required by 43 C.F.R. § 46.150(a).

143.     Neither Interior's May 12, 2025 nor its June 6, 2025 actions were "urgently needed to address imminent threats to life, property, or important natural, cultural, or historic resources," as required by 43 C.F.R. § 46.150(a).

144.     Interior failed to "consider the probable environmental consequences" of its May 12, 2025 and June 6, 2025 actions and failed to "mitigate reasonably foreseeable adverse environmental impacts to the extent practical," as required by 43 C.F.R. § 46.150(a).

145.     Federal Defendants' May 12, 2025 approval of application of the Alternative NEPA Arrangements to the Bull Mountains Mine expansion, in reliance on a nonexistent "Energy Emergency," was inconsistent with both NEPA and Interior's NEPA implementing regulations.

146.     Federal Defendants' June 6, 2025 approval of the Bull Mountains Mine expansion, pursuant to the Alternative NEPA Arrangements and in reliance on a nonexistent "Energy Emergency," was inconsistent with both NEPA and Interior's NEPA implementing regulations.

147.     Therefore, Federal Defendants' May 12, 2025 and June 6, 2025 actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in violation of 5 U.S.C. § 706(2)(A).

## SECOND CAUSE OF ACTION

### (NEPA Violation: Failure to Issue a Draft EIS or Solicit Public Comments on a Draft EIS)

148.    Plaintiffs incorporate by reference all preceding paragraphs.

149.    OSM and Interior are "agenc[ies]" as defined in 5 U.S.C. § 551(1) and "agencies of the Federal Government" within the meaning of NEPA.

150.    At the time of the June 6, 2025 Bull Mountains mine expansion approval, Federal Defendants' NEPA regulations required them to issue a draft EIS and provide the public with an opportunity to comment on it. *See* 43 C.F.R. § 46.435(a), (b) (2008); 40 C.F.R. § 1503.1(a)(2)(v) (2024); *see also* 43 C.F.R. § 46.20(a) ("This part supplements, and is to be used in conjunction with, the CEQ regulations except where it is inconsistent with other statutory requirements.").

151.    Federal Defendants failed to issue a draft EIS prior to approving the Bull Mountains mine expansion, as required by 43 C.F.R. § 46.435(a) (2008) and 40 C.F.R. § 1503.1(a) (2024).

152.    Federal Defendants failed to provide an opportunity for public comment on the EIS prior to approving the Bull Mountains mine expansion, as required by 43 C.F.R. § 46.435(a) (2008) and 40 C.F.R. § 1503.1(a)(2)(v) (2024).

153.    Therefore, Federal Defendants' June 6, 2025, approval of the Bull Mountains Mine expansion was arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

### THIRD CAUSE OF ACTION

### (NEPA and APA Violation: Failure to Respond to Public Comments)

37

154.    Plaintiffs incorporate by reference all preceding paragraphs.

155.    An agency must provide responses to individual comments or groups of comments it received. 40 C.F.R. § 1503.4 (2024); *see also Oregon Nat'l Res. Council v. Marsh*, 52 F.3d 1485, 1490 (9th Cir. 1995) ("An agency preparing an EIS has a duty to assess, consider, and respond to *all* comments[.]" (emphasis in original)); *Ohio v. EPA*, 603 U.S. 279, 293–94 (2024).

156.    Conservation groups, including Plaintiffs Sierra Club and MEIC, submitted extensive comments to OSM during 2023 and 2024 scoping periods for the Bull Mountains Mine expansion.

157.    At the time of the June 6, 2025 approval, Federal Defendants had provided no responses to any comments they received during the 2023 or 2024 scoping periods, as required by 40 C.F.R. § 1503.4(a) (2024); *see also* 43 C.F.R. § 46.20(a) (2008).

158.    Had OSM considered comments submitted by conservation groups, it would have considered significant issues concerning the water resources at Bull Mountains Mine and other environmental harms posed by coal extraction.

159.    Therefore, Federal Defendants' June 6, 2025, approval of the Bull Mountains mine expansion was arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

**FOURTH CAUSE OF ACTION**

**(NEPA and APA Violation: Failure to Take a Hard Look at Mine Dewatering)**

160.    Plaintiffs incorporate by reference all preceding paragraphs.

161.    The final EIS issued by Federal Defendants on June 6, 2025, repeatedly concluded that any impacts to water quantity from the proposed mine expansion would be mitigated by an "approved mitigation plan" issued by the Montana Department of Environmental Quality. *See, e.g.*, Final EIS at 4.4-18–4.4-19.

162.    Federal Defendants failed to consider and/or address extensive expert material submitted by Plaintiffs showing that Federal Defendants' assumptions about water quantity mitigation were unsupportable, that dewatering impacts had been extensive, and the capacity of the deep aquifer to mitigate impacts to water was significantly limited and likely inadequate.

163.    Federal Defendants failed to consider and/or address extensive expert material submitted by Plaintiffs, including the Gardner study and the testimony of Dr. Nicklin, showing that the mine expansion would cause dewatering in the area that would far exceed any mitigation efforts, including mitigation included in the "approved mitigation plan" issued by the Montana Department of Environmental Quality.

164.    Upon information and belief, Federal Defendants failed to consider and/or address expert material generated internally by former staff of Federal Defendants demonstrating that impacts to water quantity from the Bull Mountains

mine expansion could not be mitigated.

165.    For the foregoing reasons, Federal Defendants failed to take a "hard look" at significant impacts to water resources from mining or consider materials indicating that Signal Peak will not be able to replace damaged water resources.

166.    Therefore, Federal Defendants' June 6, 2025 approval of the Bull Mountains mine expansion was arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.    Declare that Federal Defendants' actions violate NEPA and the regulations and policies promulgated thereunder;

B.    Vacate and set aside Federal Defendants' actions;

C.    Enjoin Federal Defendants from re-issuing or approving the mining plan modification until Federal Defendants have demonstrated compliance with NEPA and the APA;

D.    Enjoin operations in the Mine Expansion Area until Federal Defendants have demonstrated compliance with NEPA and the APA;

E.    Award Plaintiffs their fees, costs, and other expenses as provided by applicable law;

F.    Issue such relief as Plaintiffs subsequently request or that this Court may deem

just, proper, and equitable.

Respectfully submitted this 3rd day of March, 2026.

/s/ Shiloh Hernandez
Shiloh Hernandez
Earthjustice
P.O. Box 4743
Bozeman, MT 59772-4743
(406) 586-9699
shernandez@earthjustice.org

Melissa Hornbein
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
(406) 443-3501
hornbein@westernlaw.org

Daniel Timmons, *pro hac vice pending*
Western Environmental Law Center
409 E. Palace Ave. #2
Santa Fe, NM  87501
(505) 570-7014
timmons@westernlaw.org

Brandon Jones-Cobb, *pro hac vice pending*
Center for Biological Diversity
P.O. Box 30604
Seattle, WA 98113-0604
(564) 397-0830, ext. 478
bjonescobb@biologicaldiversity.org

*Attorneys for Plaintiffs*