Shiloh Hernandez
Earthjustice
P.O. Box 4743
Bozeman, MT 59772-4743
(406) 586-9699
shernandez@earthjustice.org

Melissa Hornbein
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
(406) 443-3501
hornbein@westernlaw.org

Daniel Timmons, *pro hac vice*
Western Environmental Law Center
409 E. Palace Ave. #2
Santa Fe, NM 87501
(505) 570-7014
timmons@westernlaw.org

Brandon Jones-Cobb, *pro hac vice*
Center for Biological Diversity
P.O. Box 30604
Seattle, WA 98113-0604
(564) 397-0830, ext. 478
bjonescobb@biologicaldiversity.org

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MONTANA BILLINGS DIVISION

| | |
|---|---|
| MONTANA ENVIRONMENTAL INFORMATION CENTER, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>DOUG BURGUM, et al.,<br><br>Defendants. | Case No. CV 26-21-BLG-DWM<br><br>**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS


TABLE OF CONTENTS .......... ii

TABLE OF AUTHORITIES .......... iv

EXHIBIT INDEX .......... viii

INTRODUCTION .......... 1

FACTS .......... 2

I. Springs and Perched Groundwater .......... 2

II. Initial Approval of the Bull Mountains Mine .......... 4

III. Signal Peak Energy Purchases the Mine .......... 7

IV. Amendment 3 Repeatedly Found Unlawful .......... 7

V. Federal Defendants' Preparation of an EIS .......... 11

VI. Energy Emergency Fiat .......... 12

LEGAL STANDARDS .......... 15

ARGUMENT .......... 16

I. The Conservation Groups Have Standing .......... 16

II. Federal Defendants' Use of Alternative Arrangements Violated NEPA and the APA Because No Emergency Circumstances Compelled Export Coal Production from the Bull Mountains Mine. .......... 17

A. President Trump's declaration of a "national energy emergency" did not supersede NEPA or applicable regulations. .......... 17

B. Nothing in the record shows that the mine expansion and export operation were necessary to respond to the immediate impacts of a domestic energy emergency. .......... 20

III. Federal Defendants Violated NEPA and the APA by Failing to Issue a Draft Environmental Impact Statement or Respond to Public Comments. ....27

IV. Federal Defendants Violated NEPA and the APA by Failing to Take a Hard Look at Overwhelming Concerns—Including from Their Own Experts—that the Mine Will Dewater the Bull Mountains and Cannot Mitigate the Loss. ....29

V. This Court Should Vacate Federal Defendants' Unlawful Approval of the Mine Expansion. ....40

A. Federal Defendants' errors—cutting out the public and ignoring the science—were serious. ....41

B. There are no disruptive consequences that would justify an equitable exception to the presumptive remedy of vacatur ....42

CONCLUSION ....44

CERTIFICATE OF COMPLIANCE ....46

# TABLE OF AUTHORITIES

## FEDERAL CASES

*350 Montana v. Bernhardt*,
443 F. Supp. 3d 1185 (D. Mont. 2020)....................8

*350 Montana v. Haaland*,
50 F.4th 1254 (9th Cir. 2022)....................8, 40

*350 Montana v. Haaland*,
No. CV 19-12, 2023 WL 1927307 (D. Mont. Feb. 10, 2023)....................*passim*

*All. for the Wild Rockies v. Weber*,
No. CV 12-90, 2013 WL 12109899 (D. Mont. July 31, 2013)....................7

*Allentown Mack Sales & Serv., Inc. v. NLRB*,
522 U.S. 359 (1998)....................21

*California v. Bernhardt*,
472 F. Supp. 3d 573 (N.D. Cal. 2020)....................21, 25

*California v. Block*,
690 F.2d 753 (9th Cir. 1982)....................41

*Cascadia Wildlands v. BLM*,
No. 24-CV-1641, 2026 WL 1998555 (D. Or. July 9, 2026)....................42

*Competitive Enter. Inst. v. NHTSA*,
901 F.2d 107 (D.C. Cir. 1990)....................27

*Ctr. for Biological Diversity v. USFS*,
No. 24-CV-930, 2026 WL 2287946 (D. Or. Aug. 9, 2026)....................42

*Ctr. for Biological Diversity v. Zinke*,
900 F.3d 1053 (9th Cir. 2018)....................30, 39

*Donaldson Bros. v. Phila. Ins. Co.*,
No. CV 06-139, 2008 WL 11349981 (D. Mont. May 14, 2006)....................43

*Forest Serv. Employees for Env. Ethics v. USFS*,
No. 16-CV-0293, 2017 WL 2962771 (E.D. Wash. July 11, 2017)....................26

*Friends of Animals v. BLM*,
No. 16-CV-1670, 2018 WL 1612836 (D. Or. April 2, 2018)............................26

*Heartland Reg'l Med. Ctr. v. Sebelius*,
566 F.3d 193 (D.C. Cir. 2009)..........................................................................41

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
780 F. Supp. 3d 135 (D.D.C. 2025)..................................................................18

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)....................................................................................16, 20

*Michigan v. Dep't of Energy*,
No. 25-1159, 2026 WL 2671756 (D.C. Cir. Sept. 11, 2026) .......................22, 24

*Michigan v. EPA*,
576 U.S. 743 (2015)..........................................................................................21

*Mont. Env't. Info. Ctr. v. Haaland*,
No. CV 19-130, 2022 WL 2466794 (D. Mont. Feb. 11, 2022)....................38, 39

*Mont. Env't Info. Ctr. v. U.S. Office of Surface Mining* (*MEIC*),
274 F. Supp. 3d 1074 (D. Mont. 2017)..............................................2, 7, 8, 16

*Mont. Env't Info. Ctr. v. U.S. Office of Surface Mining*,
No. CV-15-106, 2017 WL 5047901 (D. Mont. Nov. 3, 2017)............................8

*Mont. Wildlife Fed'n v. Haaland*,
127 F.4th 1 (9th Cir. 2025) ...............................................................................41

*Motor Vehicle Mfrs. v. State Farm*,
463 U.S. 29 (1983)......................................................................................15, 30

*N. Cascades Conservation Council v. USFS*,
136 F.4th 816 (9th Cir. 2025) ...........................................................................15

*Nebraska v. Su*,
121 F.4th 1 (9th Cir. 2024) ...................................................19, 20, 21, 25

*NRDC v. Winter*,
527 F. Supp. 2d 1216 (C.D. Cal. 2008) ...........................................................26

*Ohio v. EPA*,
603 U.S. 279 (2024)....................................................................28, 29, 30, 39

*Or. Nat. Res. Council v. Marsh*,
52 F.3d 1485 (9th Cir. 1995) ...........................................................27, 28

*Oregon-California Trails Ass'n v. Hogan*,
No. 26-CV-862, 2026 WL 1649573 (D. Colo. June 8, 2026)..........21, 22, 24, 25

*Pollinator Stewardship Council v. EPA*,
806 F.3d 520 (9th Cir. 2015) ...........................................................40, 42

*Signal Peak Energy, LLC v. Haaland*,
No. 24-CV-366, 2024 WL 3887386 (D.D.C. Aug. 21, 2024)............................12

*United States v. Morton Salt Co.*,
338 U.S. 632 (1950).............................................................................16

*W. Watersheds Project v. Kraayenbrink*,
632 F.3d 472 (9th Cir. 2011) ...........................................................30, 39

*W. Watersheds Project v. Schultz*,
No. CV 22-149, 2025 WL 2658776 (D. Mont. Sept. 17, 2025).........................15

*WildEarth Guardians v. U.S. Dep't of Agric.*,
795 F.3d 1148 (9th Cir. 2015) .................................................................16

*Winter v. NRDC*,
555 U.S. 7 (2008)..................................................................................26

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952)..............................................................................18

**STATE CASES**

*Bull Mountains Land All. v. DEQ*,
No. DV-56-2024-1218-OC (Mont. 13th Jud. Dist. Ct. Dec. 30,
2025) .................................................................................................17

*Kauffman-Harmon v. Kauffman*,
2001 MT 238, 36 P.2d 408 ....................................................................43

## STATUTES AND LEGISLATIVE MATERIALS

5 U.S.C.
§ 706....................................................................................................40
§ 706(2)(A) ...............................................................................15, 26, 39

42 U.S.C.
§ 4332....................................................................................................25

50 U.S.C.
§ 1621(a) ...............................................................................................18
§ 1631....................................................................................................18

## REGULATIONS AND ADMINISTRATIVE MATERIALS

40 C.F.R.
§ 1503.1(a)(2) (2024)..............................................................................28
§ 1503.4(a) .............................................................................................28
§ 1503.4(a) (2024) ..................................................................................29

43 C.F.R.
§ 46.20(a) ...............................................................................................27
§ 46.20(a) (2024) ....................................................................................28
§ 46.20(b) (2024) ....................................................................................29
§ 46.20(c) (2024) ....................................................................................28
§ 46.150......................................................................................... *passim*
§ 46.150 (2008)........................................................................................19
§ 46.150(a) .....................................................................................21, 22, 24
§ 46.150(d)...............................................................................................22
§ 46.435(a) (2024) ...............................................................................27, 29

73 Fed. Reg. 61292 (Oct. 15, 2008).............................................................22

90 Fed. Reg. 10610 (Feb. 25, 2025) ............................................................27

91 Fed. Reg. 8758 (Feb. 24, 2026) ..............................................................19

90 Fed. Reg. 8433 (Jan. 20, 2025) ......................................................... *passim*

# EXHIBIT INDEX

Exhibit 1 Declaration of Anne Hedges

Exhibit 2 Declaration of James Jensen

Exhibit 3 Declaration of Tom Baratta

Exhibit 4 Declaration of Patrick Thiele

## INTRODUCTION

Presented with extensive evidence of the mine's harmful impacts, this Court and the Ninth Circuit Court of Appeals have, on three occasions, reversed decisions by the Department of Interior (DOI) and U.S. Office of Surface Mining Reclamation and Enforcement (together, "Federal Defendants") for refusing to prepare a detailed environmental impact statement (EIS) for the Amendment 3 (AM3) expansion of the Bull Mountains coal export mine. In 2024, Federal Defendants grudgingly agreed to conduct the required review, but current agency leadership—under pressure from Intervenor Signal Peak Energy, LLC—made that review a charade.

In 2025, at the request of Signal Peak and under the pretext of a domestic "energy emergency," Federal Defendants abruptly announced that—in violation of their own rules, the National Environmental Policy Act (NEPA), and the Administrative Procedure Act (APA)—they would simply cut the public out and approve the coal export project. They skipped issuing a draft EIS for public review and comment. They refused to respond to or otherwise address public scoping comments. And their direct-to-final EIS ignored expert comments—with which their own experts concurred—that Signal Peak is "very unlikely" to be able to mitigate springs and wells in the Bull Mountains dewatered by its subsidence mining. Without these vital waters, neither wildlife, nor ranchers, nor residents can

persist in the Bull Mountains. Signal Peak knows this and is forcing ranchers from the area because—the company admits—it cannot replace damaged water supplies.

Federal Defendants have once again failed to provide the transparency and accountability the law demands. This violated NEPA and the APA, and this Court should again overturn this unlawful action.

## FACTS

This Court has reviewed the factual setting of the Bull Mountains Mine before. *Mont. Env't Info. Ctr. v. U.S. Office of Surface Mining* (*MEIC*), 274 F. Supp. 3d 1074, 1082–85 (D. Mont. 2017). As such, an abbreviated account follows.

### I. Springs and Perched Groundwater

The Bull Mountains, located between Billings and Roundup, Montana, are an island range in the Northern Great Plains. OSM-030796. Their summits reach 4,700 feet and are often capped with sandstone or "conspicuous red" clinker[1] mesas and buttes. OSM-000144; OSM-030796. Their slopes and valleys are clothed in ponderosa pine and juniper forests interspersed with sage brush and prairie grassland. OSM-030796.

[1] Clinker or "scoria" formed when exposed coal beds burned naturally, baking and melting adjacent sandstone and shale. OSM-001371, -001509.

The area is semi-arid. OSM-030796. Consequently, "the limited water resources are extremely important." OSM-011632. The sandstone- and clinker-capped mesas act as high-quality freshwater reservoirs. OSM-027495. Snowmelt and precipitation infiltrate the clinker and percolate into permeable rock layers (strata), like sandstone or coal. OSM-001377; OSM-001308. When the downward movement of groundwater reaches impermeable strata, like shale, it "discharges at springs," as shown below. OSM-001377; OSM-005152–54; OSM-030859.




*Figure 1:OSM-001381*

The saturated sandstone and coal in the Bull Mountains constitute "perched aquifers that feed area springs and seeps." OSM-022052; OSM-030840. Wetlands

associated with springs "account[] for less than 0.1 percent of the Bull Mountains" but "play[] an important role in local ecosystems." OSM-001383. "All animals found in the mine plan area use the streams, ponds, and springs, and related habitat to a greater or lesser degree." OSM-001387.

The scattered springs and perched aquifers are also vitally important to ranchers. OSM-001377; OSM-001640 (rancher noting that "[a]ny consistent 3–5 gallon per minute spring is a very valuable livestock and wildlife resource").

## II. Initial Approval of the Bull Mountains Mine

The Bull Mountains Mine was originally permitted in 1992, following preparation of an EIS. From the outset, it was proposed as a longwall operation that removes the entirety of the coal seam and allows the rock above the seam to collapse and subside as mining advances. OSM-001327, -001572. This raised concerns—especially from Bull Mountains ranchers—about impacts to groundwater and springs that still have not been resolved. *E.g.*, OSM-001614–20 (public comments addressing hydrology).

In the 1990s, state regulators hired a prominent professor of hydrogeology from Pennsylvania (Dr. Richard Parizek) to evaluate potential impacts. OSM-001232. The resulting draft report found it "highly likely" that the mine would "serve as a regional groundwater underdrain to the Bull Mountains," OSM-001296, and "likely" it would "partly or completely dewater[]" the perched

groundwater above the mine. OSM-001241. Given the semiarid nature of the Bull Mountains, "[t]here is little margin for error." OSM-001246. The impact of subsidence on the perched aquifers above the mine is, as one rancher explained, like "dropping plates off a balcony on to a concrete floor." OSM-021055. Dr. Parizek diagrammed how subsidence fracturing would allow groundwater to flow downward into the mine pit and drain the aquifers:




*Figure 2: OSM-001255*

The professor worked with Keith Kirk, Chief of Technical Information Processing for the Office of Surface Mining, who prepared a "3d empirical ground water quality model" to assess impacts to hydrology. OSM-001237, -001319. For

unknown reasons, state regulators ignored Dr. Parizek's and Mr. Kirk's work, and it disappeared from the record. OSM-021050; *see also* OSM-025742 (public comments from 2024 inquiring about fate of Parizek study). Mr. Kirk's modeling—apparently "lost" by regulators—concluded that subsidence would "irreversibly reduc[e] or eliminat[e] the supply of water to those springs and aquifers" above the mine and that the lost water supplies "could not be mitigated if mining were to take place." (Doc. 1-2 at 2–3.)

While Mr. Kirk's study has been "lost," his conclusion was consistent with the findings of numerous Montana government scientists who, in 1992, urged agency leadership to deny approval of the mine due to expected impacts to water, wildlife, and ecology:

> The springs and associated perennial stream reaches which may be impacted by mining are the direct result of biogeochemical forces interacting over geological time spans. These complex systems represent the most valuable long-term assets which may occur on semi-arid lands, both from a ranching and a wildlife habitat land-use perspective. To risk the loss of these spring systems in order to obtain a coal commodity with only a fleeting value would be ecologically, and probably economically, unsound.

Declaration of Anne Hedges (Exhibit 1), Ex. A at 2 (Memorandum of David Clark); *id.* at 9 (finding impacts to springs "irreversible") (Memorandum of Tom Golnar); *id.* at 10 (finding approval of mine would violate laws protecting wildlife) (Memorandum of Shannon Heath); *id.* at 16 (finding "that it would be extremely difficult if not impossible to restore the ecosystem which will be impacted by the

proposed mine") (Memorandum of Shannon Heath); *id.* at 21–22 (recommending mine not be approved due to impacts on "exceptional" and "fragil[e]" ecology of Bull Mountains) (Memorandum of Steve Regele).[2] Regulators ignored the staff scientists' objections and approved the mine in 1992.

## III. Signal Peak Energy Purchases the Mine

No significant mining occurred until the 2000s, when Signal Peak purchased the mine and obtained the permit. OSM-030665. Thereafter, Signal Peak sought to expand the mine by approximately 7,000 acres in 2012, first through a federal coal lease, and then via Amendment 3 (AM3) to its permit to mine the leased coal. OSM-030665; *MEIC*, 274 F. Supp. 3d at 1084. The Montana Department of Environmental Quality (MDEQ) prepared a checklist environmental assessment (EA) and approved the expansion. OSM-030665, -030704. Federal Defendants approved a federal mining plan modification for the expansion in 2014, after preparing an EA of their own. OSM-030665.

## IV. Amendment 3 Repeatedly Found Unlawful

A state review board later reversed MDEQ's approval of the permit, concluding (consistent with the original concerns of ranchers and scientists) that

[2] While these findings are not in the administrative record and do not affect the merits, the record rule allows their consideration for assessing an equitable remedy, like vacatur. *See, e.g.*, *All. for the Wild Rockies v. Weber*, No. CV 12-90, 2013 WL 12109899, *1 (D. Mont. July 31, 2013).

Signal Peak and MDEQ failed to demonstrate that mitigation of impacts to springs could be accomplished. OSM-011681. Signal Peak and MDEQ had identified a sandstone aquifer approximately 300 feet below the coal seam called the "deep underburden aquifer" or "deep aquifer" as the likely source of water to mitigate the loss of perched aquifers above the mine. OSM-011642.[3] But, refuting Signal Peak's contention, a state environmental review board found that "the proposed mitigation with water from the deep underburden aquifer is illusory, as SPE [Signal Peak Energy] admitted repeatedly in the record." OSM-011681; *see also* OSM-005856–57 (Signal Peak consultant raising concerns and identifying need to evaluate "capacity" of deep aquifer to "meet existing and proposed demands" which "could substantially exceed 100 gpm [gallons per minute]").

In separate litigation over the mine's federal approvals, this Court and the Ninth Circuit subsequently reversed the federal EA, as well as a subsequent EA prepared on remand. *MEIC*, 274 F. Supp. 3d at 1105, *amended in part*, No. CV-15-106, 2017 WL 5047901 (D. Mont. Nov. 3, 2017); *350 Montana v. Bernhardt*, 443 F. Supp. 3d 1185, 1202 (D. Mont. 2020), *aff'd in part, rev'd in part sub nom. 350 Montana v. Haaland*, 50 F.4th 1254, 1273 (9th Cir. 2022).

[3] As shown below, Signal Peak continues to identify the deep aquifer—the reliability of which was deemed "illusory"—as the "most reliable (dependable) source of water" for mitigation and reclamation purposes, OSM-019011, which is telling.

Following remand from the Ninth Circuit, this Court vacated the federal mining plan modification for the AM3 expansion, based in part on impacts to ranchers' water supplies:

> Signal Peak's subsi[d]ence mining has harmed local ranching interests by creating fissures in the ranchland. Additionally, Signal Peak's mining operation causes damage to local ranchers' water resources, including in one instance, damaging working water wells. Local ranchers fear that Signal Peak's longwalls have already caused potentially irreversible damage to ranching in the Bull Mountains.

*350 Montana v. Haaland*, No. CV 19-12, 2023 WL 1927307, *5 (D. Mont. Feb. 10, 2023) (internal citations omitted). The Court's finding confirmed the prior warnings of scientists. The following is an image of a subsidence crack on ranch land above the mine:



*Figure 3: OSM-021876*

The rancher whose water had been damaged by the mine was subsequently forced to sell his herd:

> I did not stock my Bull Mountain Ranch this summer, because I could not be assured[] I would have adequate water for my cattle. Consequently, I have had to liquidate most of my cattle herd. This is a complete failure of the system that was supposed to protect ranches from mining impacts.

OSM-021019.

## V. Federal Defendants' Preparation of an EIS

In June 2023, Federal Defendants announced their intent to prepare an EIS and accepted scoping comments. OSM-030666.

A coalition of civic organizations (including the Conservation Groups) submitted comments. OSM-021882. Local ranchers commented about impacts to their water. *E.g.*, OSM-21052–55 (rancher describing "75% water loss rate" on ranch following mining); OSM-021010 (rancher explaining that "[a]lmost all of the important water resources used by cattle and wildlife that have been undermined by Signal Peak have been damaged"); OSM-021019 (rancher describing "significant impacts, primarily diminishment of water, resources, and subsidence cracking" from Signal Peak's mine); OSM-021864–68 (landowner organization detailing extensive impacts to critical springs from mine). One rancher urged the agencies to deny the expansion, noting that Signal Peak told them the company "do[es] not have to do the right thing" and, because it controlled access to ranches, "they can take us over for nothing." OSM-021789.

The agencies announced that a draft EIS would be available for public comment in the spring of 2024. (Doc. 1, ¶ 105; Doc. 16, ¶ 105.) A draft EIS would have allowed the public to present evidence and identify the shortcomings in the agencies' analyses of subsidence and water resources, including information about Mr. Kirk's study and state scientists' memoranda about the mine's irreversible impacts to water and wildlife.

Signal Peak subsequently modified its proposal, adding and removing certain mining operations. OSM-030666. In response, Federal Defendants re-opened scoping and accepted additional comments on the modified proposal. OSM-030666. The Conservation Groups submitted additional scoping comments. OSM-025684. The agencies then proposed issuing the draft EIS in spring 2025. (Doc. 1, ¶ 108; Doc. 16, ¶ 108.)

Dissatisfied with the pace of the process—that had been slowed by its own alterations to the mining proposal—in February 2024, Signal Peak sued to expedite its review. In August 2024, the Federal District Court for the District of Columbia dismissed the case as "prudentially unripe." *Signal Peak Energy, LLC v. Haaland*, No. 24-CV-366, 2024 WL 3887386, *9 (D.D.C. Aug. 21, 2024).

## VI. Energy Emergency Fiat

The agencies, however, never circulated a draft EIS for public comment. On January 20, 2025, President Donald Trump issued Executive Order 14156,

"Declaring a National Energy Emergency." 90 Fed. Reg. 8433 (Jan. 20, 2025) [hereinafter Executive Order No. 14156]. The Executive Order declared that "energy … production … of the United States [is] … far too inadequate to meet our Nation's needs." *Id.* At the time, the United States was exporting more than "4.1 million barrels [of oil] per day," was the world's largest exporter of fossil gas, and was exporting near record quantities of coal. (Doc. 1, ¶¶ 113–15, Doc. 16, ¶¶ 113–15.)

The Executive Order directed federal agencies to use authority under existing laws to expedite fossil-fuel-related projects. Exec. Order No. 14156, §§ 2–7. It did not identify any authority under NEPA. *See id.* The Executive Order excluded wind and solar power from its definitions of "energy" and "energy resources." *Id.* § 8.

On April 23, 2025, pursuant to the direction of Executive Order No. 14156 and 43 C.F.R. § 46.150, DOI and the Council on Environmental Quality (CEQ) issued a document entitled "Alternative Arrangements for Compliance with the National Environmental Policy Act amid the National Energy Emergency" (Alternative Arrangements). OSM-030667.

Two weeks later, on May 6, 2025, Signal Peak requested approval of the AM3 expansion pursuant to the Alternative Arrangements. OSM-030667; OSM-030635–36. Six days later, on May 12, 2025, the DOI's Assistant Secretary for

Land and Minerals approved the request. OSM-030667; OSM-030632–34. Federal Defendants then jettisoned preparation and issuance of a draft EIS and, instead, on June 4, 2025, issued a record of decision (ROD) approving the mine expansion and a final EIS. OSM-030709. The final EIS did not include or respond to any public comments that had been previously submitted in scoping.

While approving the expansion pursuant to the declared "emergency" caused by "energy … production" that is supposedly "inadequate to meet our Nation's needs," Exec. Order No. 14156, § 1, Federal Defendants acknowledged that expansion would not actually serve domestic energy demand. Instead, "almost all of the coal that the Mine produces is exported to Japan and South Korea." OSM-030707. These exports would, the agencies reasoned, nevertheless ameliorate the purported energy emergency by deterring Chinese aggression: "This Mine's exports help strengthen our relationship with these two important partners of the United States and make them more resilient in deterring aggression by China in the Indo-Pacific." OSM-030707.

Neither at the time the ROD was approved nor at present do Federal Defendants know if—and they certainly did not find that—there was or is a "domestic coal shortage" or if export markets for thermal coal were or are oversupplied. (Doc. 1, ¶ 118; Doc. 16, ¶ 118.)

Signal Peak sells virtually all its coal internationally under short-term one-year contracts, with no guaranteed recipient. OSM-029465. Approximately three percent of the coal is sold domestically. OSM-030753. Approximately five percent is sold to China (Hong Kong). OSM-030753.

## LEGAL STANDARDS

"[NEPA] is a procedural statute that requires federal agencies to take a 'hard look' at the environmental consequences of their actions." *N. Cascades Conservation Council v. USFS*, 136 F.4th 816, 821 (9th Cir. 2025) (quotations and citation omitted). Compliance with NEPA is reviewed under the APA. *Id.* at 824.

The APA authorizes courts to "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

> Agency action is arbitrary and capricious if the administrative record demonstrates that "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

*W. Watersheds Project v. Schultz*, No. CV 22-149, 2025 WL 2658776, *2 (D. Mont. Sept. 17, 2025) (quoting *Motor Vehicle Mfrs. v. State Farm*, 463 U.S. 29, 43 (1983)).

Judicial review under the APA serves as a "check" on administrative "zeal." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391 (2024) (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 644 (1950)). Under the APA, courts "decide legal questions by applying their own judgment" with "no deferential standard" to agencies. *Id.* at 392.

## ARGUMENT

### I. The Conservation Groups Have Standing

"To establish standing, a plaintiff must show that '(1) he or she has suffered an injury in fact that is concrete and particularized, and actual or imminent; (2) the injury is fairly traceable to the challenged conduct; and (3) the injury is likely to be redressed by a favorable court decision.'" *MEIC*, 274 F. Supp. 3d at 1086 (quoting *WildEarth Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148, 1154 (9th Cir. 2015)). An association has standing when its members have standing, provided participation of the member as a party is not necessary. *Id.*

Here, the Conservation Groups have standing, as this Court previously held. *Id.* (finding Montana Environmental Information Center and member James Jensen had standing with respect to the AM3 expansion). The groups' members, including Mr. Jensen, Tom Baratta, and Patrick Thiele, have deep roots in the Bull Mountains and will be harmed by the AM3 expansion. Declaration of James Jensen ¶¶ 6–22 (Exhibit 2); Declaration of Tom Baratta ¶¶ 2–9 (Exhibit 3);

Declaration of Patrick Thiele ¶¶ 2–13 (Exhibit 4); *see also Bull Mountains Land All. v. DEQ*, No. DV-56-2024-1218-OC at 6–7 (Mont. 13th Jud. Dist. Ct. Dec. 30, 2025) (finding standing for Messrs. Baratta and Thiele with respect to mine).

The groups' members' concerns are amplified by their discovery that federal scientists (including Mr. Kirk) concluded—30 years ago—that the mine would irreversibly harm water supplies in the Bull Mountains, but that federal regulators "lost" the report and have been ignoring the issue ever since. Jensen Decl. ¶ 14.

The Conservation Groups have standing.

## II. Federal Defendants' Use of Alternative Arrangements Violated NEPA and the APA Because No Emergency Circumstances Compelled Export Coal Production from the Bull Mountains Mine.

### A. President Trump's declaration of a "national energy emergency" did not supersede NEPA or applicable regulations.

President Trump's Inauguration Day declaration of an "energy emergency" was political theater without legal effect on Federal Defendants' responsibilities under NEPA and its implementing regulations. Exec. Order No. 14156. It was also contrary to reality. The United States was and is a global energy powerhouse, not only the world's largest exporter of fossil gas, but also exporting near-record quantities of coal and more than 4.1 million barrels per day of oil. (Doc. 1, ¶¶ 113–15, Doc. 16, ¶¶ 113–15.) Further undercutting the basic premise of a supposed "energy emergency" is the glaring omission of wind and solar energy from the definition of "energy resources" in the Executive Order. Exec. Order 14156, § 8.

Furthermore, that presidential policy directive neither suspended NEPA nor expanded Federal Defendants' regulatory emergency authority under 43 C.F.R. § 46.150.

"The President's power, if any, to issue [an executive] order must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). And, as federal courts have recognized, "the reason is simple: 'In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker.'" *League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 170 (D.D.C. 2025) (quoting *Youngstown*, 343 U.S. at 587).

The National Emergencies Act (NEA) does not provide otherwise. The NEA establishes a framework through which the President may invoke emergency authorities conferred by other laws—it does not itself supply substantive emergency powers. *See* 50 U.S.C. §§ 1621(a), 1631. Indeed, the NEA requires the President to identify the particular provisions of law under which the emergency authority will be exercised. 50 U.S.C. § 1631. Yet Executive Order 14156 did not identify any NEPA emergency authorities activated by the supposed "energy emergency." *See* Exec. Order No. 14156. The Executive Order thus could not and did not enlarge Federal Defendants' existing legal authority under NEPA. For that

reason alone, the Executive Order is legally irrelevant to whether Federal Defendants complied with the law. The approval of the expansion must be evaluated under the agencies' regulations.

A purported national energy emergency declared by executive order only qualifies as an "emergency" within the meaning of Federal Defendants' emergency NEPA regulation, "if the Responsible Official determines that an emergency exists that makes it necessary to take urgently needed actions before preparing a NEPA analysis and documentation." 43 C.F.R. § 46.150 (2008).[4] Executive Order 14156 did not—and could not—predetermine that every energy project falling within its broad scope automatically satisfied Federal Defendants' preexisting emergency regulation, especially a coal export project that does not help, but harms, national energy security by increasing domestic coal prices. OSM-014708. An executive order also cannot insulate agencies from the APA's requirements of reasoned decision-making and judicial review. *Nebraska v. Su*, 121 F.4th 1, 15 (9th Cir. 2024). To hold otherwise "would shockingly allow Presidents to insulate any

[4] A subsequently amended version of Interior's emergency regulation, promulgated in 2026, after the challenged decision, is inapplicable to this case. Citations in this brief are to the regulations in effect at the time of the challenged June 4, 2025, decision. In any event, the new regulation did not substantively change the basic requirement that the Responsible Official make a determination that "an emergency exists that makes it necessary to take actions to address imminent threats to life, property, or important natural, cultural, or historic resources before preparing an environmental document or documenting the use of a categorical exclusion." 43 C.F.R. § 46.150; 91 Fed. Reg. 8758 (Feb. 24, 2026).

desired rulemaking from judicial review with the single stroke of an executive pen," *id.*, and nullify the APA's intended "check" on administrative zeal. *Loper Bright Enters.*, 603 U.S. at 391.

Nor did Federal Defendants' general adoption of "alternative arrangements" for energy projects establish that the mine expansion and the resulting coal exports are, in fact, urgently needed to address an actual emergency. OSM-030667; 43 C.F.R. § 46.150. Before dispensing with ordinary NEPA procedures, Federal Defendants first had to determine that the mine expansion independently satisfied the specific requirements of 43 C.F.R. § 46.150. As explained below, the record contains no such determination, and approval of the mine expansion and export operation plainly falls outside the scope of Interior's emergency authority.

### B. Nothing in the record shows that the mine expansion and export operation were necessary to respond to the immediate impacts of a domestic energy emergency.

Here, Federal Defendants' approval of the mine expansion did not satisfy their own regulations governing emergency actions under NEPA. As noted, a Presidential emergency declaration does not override the applicable regulations, under which the "Responsible Official" in charge of the NEPA process must determine not only that "an emergency exists," but also that such emergency "makes it necessary to take urgently needed actions before preparing a NEPA analysis and documentation" is required. 43 C.F.R. § 46.150; *Oregon-California*

*Trails Ass'n v. Hogan*, No. 26-CV-862, 2026 WL 1649573, *9 (D. Colo. June 8, 2026) (holding reference to Executive Order 14156 to approve transmission project did not satisfy requirement of National Historic Preservation Act emergency regulation that action was "essential and immediate response" to emergency); *see also Nebraska*, 121 F.4th at 15. Federal Defendants made no such finding.

Presidential fiat does not displace the need for the Federal Defendants to comply with their regulations or the need for actual fact-finding and reasoned decision-making. *See California v. Bernhardt*, 472 F. Supp. 3d 573, 611 (N.D. Cal. 2020) (noting that "the President did not alter by fiat what constitutes the best available science"); *Michigan v. EPA*, 576 U.S. 743, 750 (2015) ("Federal administrative agencies are required to engage in 'reasoned decisionmaking.'" (quoting *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998))).

The specific regulatory language governing Federal Defendants' approval of the mine expansion narrowly limits the use of emergency procedures: "[t]he Responsible Official may take those actions necessary to control the immediate impacts of the emergency that are urgently needed to mitigate harm to life, property, or important natural, cultural, or historic resources." 43 C.F.R. § 46.150(a). And for actions likely to have significant environmental impacts, alternative arrangements could "apply only to the proposed actions necessary to control the immediate impacts of the emergency." *Id.* § 46.150(d).

Those limitations are intentionally demanding. When promulgating 43 C.F.R. § 46.150, Interior rejected concerns that the rule might become a routine means of bypassing NEPA's procedural requirements, explaining that "emergency" retained its ordinary meaning: "an unforeseen combination of circumstances or the resulting state that calls for immediate action" or, "a sudden, urgent, usually unexpected occurrence or occasion requiring immediate action." 73 Fed. Reg. 61292, 61301 (Oct. 15, 2008) (quoting dictionary definitions). Thus, alternative arrangements are only authorized where necessary to control the immediate impacts of an unforeseen or sudden occurrence requiring immediate action and the "responsible official[]" determines such is the case. *Id.*

Federal Defendants made no finding satisfying those requirements here. The approval identified no imminent danger to life, property, or important resources necessitating urgent approval of the mine expansion. Nor did Federal Defendants identify any "immediate impacts" of an emergency which urgent approval of the mine expansion was "necessary to control." 43 C.F.R. § 46.150(a), (d); *Oregon-California Trails Ass'n*, 2026 WL 1649573 at *9; *see also Michigan v. Dep't of Energy*, No. 25-1159, 2026 WL 2671756 at *16 (D.C. Cir. Sept. 11, 2026) (finding "emergency" order to operate retiring coal plant exceeded agency authority where agency failed to identify "specific[]" "circumstances" requiring "immediate action"). And they did not explain why completion of the ordinary NEPA

process—which had been underway for approximately two years and was nearing completion, OSM-030666—would prevent them from responding to any identified emergency.

Instead, Federal Defendants treated the President's general declaration as sufficient in and of itself for concluding that the mine expansion was eligible for emergency procedures:

> Because SPE seeks a mining plan modification for its Bull Mountains Mine No. 1 in order to produce leased Federal coal—which is a covered "energy resource" under the national energy emergency—the mining plan modification is eligible for the Department's alternative arrangements for NEPA compliance.

OSM-030633. Thus, instead of explaining how the mine expansion qualified for emergency procedures under 43 C.F.R. § 46.150—which it does not—Federal Defendants relied on the Executive Order's statement that "[e]nergy security is an increasingly crucial theater of global competition," and argued that the project "seeks to advance energy production in response to the national energy emergency declaration." OSM-030633 (quoting Exec. Order 14156).[5]

But this is not the determination required by 43 C.F.R. § 46.150. Federal Defendants' rationale concerns long-term geopolitical and economic policy—that

---

[5] This statement by the Acting Assistant Secretary of Land and Mineral Management was demonstrably false as a factual matter. Signal Peak's mine expansion has been proposed for years and was therefore not a project seeking to "advance energy production in response to the national energy emergency declaration." OSM-030633.

exporting Bull Mountains coal could strengthen the energy security of Japan and South Korea, support American jobs, and reduce the trade deficit. OSM-030634. But whatever the merits of those long-term policy objectives, none identifies a present emergency, let alone an immediate impact of an emergency that continued coal exports are necessary to control. *See Oregon-California Trails Ass'n*, 2026 WL 1649573 at *9; *Michigan*, 2026 WL 2671756 at *17 (finding concerns about "[l]ong-term resource adequacy risks" could not support agency's emergency authority). Here, no such immediate impact exists. Nor do Federal Defendants explain how permitting future mining of export coal is "urgently needed to mitigate harm to life, property, or important natural, cultural, or historic resources," 43 C.F.R. § 46.150(a)—a list that notably excludes any mention of purported economic benefits.

Further demonstrating a lack of reasoned decision-making, Federal Defendants had no knowledge of whether—and made no findings that—there was a "domestic coal shortage" or export markets for thermal coal (like that exported by Signal Peak) were or are oversupplied. (Doc. 1, ¶ 118; Doc. 16, ¶ 118.) Instead, Federal Defendants stated quite plainly the agency's actual rationale for relying on its emergency procedures: "because expediting this NEPA review aligns with the objectives of the national energy emergency declaration." OSM-030634.

But alignment with presidential policy objectives is not the regulatory standard for bypassing NEPA's procedures or reasoned decision-making. *See Nebraska*, 121 F.4th at 15 (explaining that an executive order cannot insulate agencies from APA review); *Oregon-California Trails Ass'n*, 2026 WL 1649573 at *9; *see also California*, 472 F. Supp. 3d at 611. Federal law, 43 C.F.R. § 46.150, requires a direct connection between the mine expansion and an actual emergency demanding immediate responsive action. Federal Defendants could not replace that requirement with the far broader inquiry whether expedited approval would advance the President's preferred fossil-fuel agenda. Executive Order 14156 does not supersede NEPA.

Reading 43 C.F.R. § 46.150 to permit Federal Defendants to short-cut the NEPA process for the broad range of activities contemplated by Executive Order 14156—"the identification, leasing, siting, production, transportation, refining, and generation of domestic energy resources," meaning "crude oil, natural gas, lease condensates, natural gas liquids, refined petroleum products, uranium, coal, biofuels, geothermal heat, the kinetic movement of flowing water, and critical minerals"—would subvert Congress's directive that agencies comply with their NEPA duties "to the fullest extent possible." 42 U.S.C. § 4332. "Such a reading also produces the absurd result of permitting agencies to avoid their NEPA obligations by re-characterizing ordinary, planned activities as 'emergencies' in the

interests of national security, economic stability, or other long-term policy goals." *NRDC v. Winter*, 527 F. Supp. 2d 1216, 1231-32 (C.D. Cal. 2008), *rev'd on other grounds by Winter v. NRDC*, 555 U.S. 7 (2008).

Federal Defendants' historical use of emergency procedures confirms the mismatch here. Prior uses involved circumstances such as creating a fire line in response to an active wildfire or relocating animals in the immediate aftermath of a fire—urgent actions needed to protect lives or important resources. *E.g.*, *Forest Serv. Employees for Env. Ethics v. USFS*, No. 16-CV-0293, 2017 WL 2962771, *1–4 & n. 7 (E.D. Wash. July 11, 2017) (cutting trees to create a fire line under similar Forest Service regulation); *Friends of Animals v. BLM*, No. 16-CV-1670, 2018 WL 1612836, *8 (D. Or. April 2, 2018) (relocating animals after wildfire). By contrast, the Bull Mountains mine expansion has been proposed for years, and Federal Defendants have been preparing an EIS since 2023, which was presumably nearing completion. Nothing about this longstanding proposal suddenly required short-circuiting the ordinary, ongoing environmental review process.

In short, Federal Defendants' reliance on "alternative arrangements" was arbitrary and capricious, 5 U.S.C. § 706(2)(A), and violated the emergency provisions of 43 C.F.R. § 46.150, rendering Federal Defendants' June 4, 2025 approval unlawful. OSM-030709.

### III. Federal Defendants Violated NEPA and the APA by Failing to Issue a Draft Environmental Impact Statement or Respond to Public Comments.

Without their arbitrary and capricious reliance on emergency procedures, Federal Defendants' approval of the expansion plainly violated NEPA and the APA.

NEPA's purpose is "ensuring well-informed government decisions and stimulating public comment on agency actions." *Or. Nat. Res. Council v. Marsh*, 52 F.3d 1485, 1490 (9th Cir. 1995) (quoting *Competitive Enter. Inst. v. NHTSA*, 901 F.2d 107, 123 (D.C. Cir. 1990)). Thus, Federal Defendants were required to "seek comment from the public as part of … [a] notice of availability for a draft environmental impact statement." 43 C.F.R. § 46.435(a) (2024). This requirement supplements the parallel obligation under the CEQ's former regulations,[6] which similarly required agencies to "[r]equest the comments of … [t]he public, affirmatively soliciting comments in a manner designed to inform those persons or

[6] CEQ's NEPA regulations had been withdrawn by the time of Federal Defendants' June 25, 2025, approval. *See* 90 Fed. Reg. 10610 (Feb. 25, 2025). But CEQ still directed agencies to "consider voluntarily relying on those regulations in completing ongoing NEPA reviews." Katherine R. Scarlett, Implementation of the National Environmental Policy Act, at 1 (Feb. 19, 2025), *available at* https://nepa.gov/sites/default/files/documents/CEQ%20Memo-Implementation%20of%20NEPA%2002.19.2025.pdf. More importantly, the CEQ regulations were still incorporated into Interior's parallel regulations through 43 C.F.R. § 46.20(a) (noting that Interior's regulations "supplement[]," and should "be used in conjunction with, the CEQ regulations"). The Conservation Groups thus refer to the pre-rescission version of CEQ's regulations in this Motion.

organizations who may be interested in or affected by the proposed action." 40 C.F.R. § 1503.1(a)(2) (2024); *see also* 43 C.F.R. § 46.20(a) (2024).

In addition, "[a]n agency preparing an EIS has a duty to assess, consider, and respond to *all* comments, even those relating to environmental factors not mentioned during the scoping process." *Marsh*, 52 F.3d at 1490 (emphasis in original) (citing 40 C.F.R. § 1503.4(a)). Thus, Federal Defendants were required to "consider … public and agency comments … and responses to those comments, as part of consideration of the proposal" and "include such documents, including supplements, comments, and responses as part of the administrative file." 43 C.F.R. 46.20(c) (2024). Indeed, providing "no reasoned response" to public comments that raise important issues violates the basic requirements of reasoned administrative decision-making under the APA. *Ohio v. EPA*, 603 U.S. 279, 293–94 (2024).

When they finalized the EIS and approved the mining plan modification for the AM3 expansion, Federal Defendants made no effort to comply with these requirements. Rather—based on their unlawful conclusion that the NEPA alternative arrangements applied to the project, *see supra* Argument Part II—Federal Defendants chose not to publish a draft EIS or solicit comments on it. *See, e.g.*, OSM-030649–50. In fact, the agencies did not even provide the 10-day comment period typically afforded projects approved under the alternative

arrangements, concluding—like a self-fulfilling prophecy—that a comment period would be "unlikely to yield different, substantive comments," OSM-030654, since they had solicited comments at earlier points in the NEPA process, OSM-030634.

Federal Defendants also made no effort to document that they considered—let alone provided responses to—comments submitted on the mine expansion. *See generally* OSM-030653–031345; *cf.* OSM-014890–014957 (documenting responses to comments in May 2018 EIS for Bull Mountains Mine No. 1 expansion). Of particular relevance here, that means Federal Defendants entirely failed to consider and respond to comments submitted by the Conservation Groups on July 27, 2020, OSM-015973–016017; September 6, 2023, OSM-021881–021891; and June 14, 2024, OSM-025683–025795—not to mention the Gardner Report discussed below. By failing to publish a draft EIS, solicit comment on it, or respond to comments, OSM violated NEPA, its implementing regulations, and the APA. 43 C.F.R. §§ 46.20(b), 46.435(a) (2024); 40 C.F.R § 1503.4(a) (2024); *Ohio*, 603 U.S. at 293–94.

## IV. Federal Defendants Violated NEPA and the APA by Failing to Take a Hard Look at Overwhelming Concerns—Including from Their Own Experts—that the Mine Will Dewater the Bull Mountains and Cannot Mitigate the Loss.

An agency decision is arbitrary and capricious if it "failed to consider an important aspect of the problem," *Motor Vehicle Mfrs.*, 463 U.S. at 43, such as when an agency "offers no meaningful response to serious and considered

comments by experts," *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 492–93 (9th Cir. 2011), or fails to discuss an expert study that "contradicts" the agency's position. *Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1068–69 (9th Cir. 2018). An agency may not "sidestep" important issues raised in public comments, *Ohio*, 603 U.S. at 295, or ignore an important issue identified by its own experts. *W. Watersheds Project*, 632 F.3d at 492–93.

As noted above, regulators, scientists, and ranchers have long raised concerns that Signal Peak's subsidence mining will fracture perched aquifers—like dropping plates from a balcony onto a concrete floor, OSM-021055—and drain the vital groundwater that sustains the ecology and ranching economy of the Bull Mountains. *See supra* Facts Parts I–IV.

Here, Signal Peak acknowledged in its application (in a document called the "Probable Hydrologic Consequences" or "PHC" report) that its subsidence mining may dewater springs and wells. OSM-023564–65. Consistent with Dr. Parizek's observation in 1990 that the mine would "serve as a regional groundwater underdrain to the Bull Mountains," OSM-001296, and "likely" would "partly or completely dewater[]" the perched groundwater above the mine, OSM-001241, Signal Peak's consultant recognized that its subsidence mining would fracture the strata above the mine, creating flow paths that drain perched groundwater, as

shown in the following figure that represents a cross-section of the mountains before and after subsidence:




*Figure 4: OSM-023346*

Currently, Signal Peak acknowledges that the mine is draining over 1,000 gallons per minute (gpm) of "[s]trata contributions" from the perched aquifers above the mine and the coal seam aquifer. OSM-023610–11. As a result, springs and wells have gone dry after undermining, as shown below:



*Figure 5: Mountain Spring After Undermining, OSM-025691*



*Figure 6: Litsky Spring After Undermining, OSM-025717*

The coal company, however, dismissed these impacts on the basis that it could replace *any amount* of lost water by drilling wells into the deep aquifer (or "deep Underburden"), located approximately 300 feet below the coal seam. OSM-023564–65, -023615. The deep aquifer, Signal Peak asserted, "has sufficient capacity and quality to serve both existing needs and *any* mitigation needs." OSM-023565 (emphasis added).

The Conservation Groups submitted an expert report, prepared by Dr. Payton Gardner, professor of hydrogeology at the University of Montana, which refuted Signal Peak's analysis. OSM-027492–500. The report identified numerous significant flaws in Signal Peak's evaluation of impacts to groundwater and

springs,[7] conducted a quantitative model simulation of Signal Peak's proposed mitigation from the deep aquifer based on Signal Peak's own data, and concluded that the coal company is unlikely to be able to mitigate even 6 gpm, i.e., *less than one percent* of the 1,000 gpm its subsidence mining is currently draining from the Bull Mountains (before adding the expansion):

> Current mine drainage from shallower groundwater is around 1000 gpm, and model forecasted drainage is over 800 gpm [gallons per minute] for over 50 years (Water and Environment Technologies, 2024b). If even a fraction of this drainage water needed to be mitigated, far more th[an] 6 gpm will need to be pumped from the sandstone aquifer. *Given this probabilistic analysis of drawdown from a single well, and the fact the mitigation water could be needed for many shallow groundwater wells and springs due to mining it is highly unlikely that the lower [deep] aquifer can be expected to supply more than a few pumping wells at all, and very unlikely mitigation would occur without very significant adverse effects to existing users of this aquifer both within and outside of the mine boundary.* The PHC simply states that this confined sandstone has adequate water, without any quantifiable calculation, which is not scientifically justifiable, and likely incorrect.

OSM-027498 (emphasis added).[8]

---

[7] Signal Peak's evaluation is contained principally in the Probable Hydrologic Consequences (PHC) report, OSM-027494, and another report called the "Groundwater Model" Report, OSM-031147.

[8] Six gpm is less than one percent of the 800–1000 gpm that Signal Peak is draining and is projected to continue to drain from the Bull Mountains. OSM-027498; OSM-023610.

Internally, Federal Defendants' experts did not dispute and largely agreed with Dr. Gardner's refutation of Signal Peak's analysis on the grounds that Signal Peak:

- "minimize[d] the occurrence and importance of the water sources" that could be impacted by subsidence (OSM-025877 (comment 1));
- included "key assumption[s] without supporting documentation" about impacts of subsidence on groundwater (OSM-025877 (comment 3));
- did not "well characterize," i.e., adequately describe, the "deep underburden aquifer," which Signal Peak proposed as the source of mitigation water (OSM-025878 (comment 1));
- "downplay[ed] potential impacts to these springs and or wells but provide[d] little to no quantitative analysis of the actual risk and effects" of Signal Peak's subsidence mining on groundwater (OSM-025878 (comment 4, "[a]gree[ing]"));
- made assumptions about the hydraulic flow from subsidence fractures (i.e., dewatering) that created "significant potential bias,"[9] (OSM-025878 (comment 1, "[a]gree[ing]"));

[9] Dr. Gardner noted that correcting for this bias would require creation of new models to test if Signal Peak's assumptions are "scientifically defensible." OSM-025877–025880.

- failed to include an "uncertainty analysis" that is "SOP [standard operating practice] for groundwater modeling" (OSM-025879 (comment 3)), and
- "state[d] that this confined sandstone [the deep aquifer] has adequate water [for mitigation], without any quantifiable calculation, which is not scientifically justifiable, and likely incorrect" (OSM-025881 (comment 3, "[a]gree[ing] that this needs to be quantified")).

OSM-025877–025881 (to view agency comments on report select "tools" in document header, then select "comment" from menu, then view comments in side panel of portable document format (pdf.)).

The agency experts acknowledged that Dr. Gardner's model simulation—demonstrating quantitatively the inability of the chosen water mitigation source (the deep aquifer) to provide even minimal mitigation water (6 gpm)—was serious and required a response: "*Looks like receipts—we need to evaluate this comment seriously.*" OSM-025880 (page 6 comment 4) (emphasis added).

Dr. Gardner's conclusion—that mitigation of the mine's harm to water resources is "very unlikely" without taking water from existing users—was

consistent with the longstanding concerns of ranchers,[10] regulators,[11] scientists,[12] and even Signal Peak itself.[13]

---

[10] *E.g.* OSM-021052–021055 (rancher describing "75% water loss rate" following mining); OSM-021010 (rancher explaining "[a]lmost all of the important water resources used by cattle and wildlife that have been undermined by Signal Peak have been damaged"); OSM-021019 (rancher describing "significant impacts" from mining resulting in his "liquidat[ing]" his herd); OSM-021864–021868 (landowner organization detailing extensive impacts to critical springs).

[11] OSM-011597, -011681 (Montana Board of Environmental Review concluding that "proposed mitigation with water from the deep underburden aquifer is illusory, as SPE [Signal Peak Energy] admitted repeatedly in the record").

[12] *E.g.*, OSM-012503–012506 (report of professional geologist Mark Hutson noting Signal Peak report stating that reclamation needs could exceed 100 gpm and concluding that "[t]he capacity of the deep underburden aquifer to produce potentially over 100 gpm[], in perpetuity, without impacting other users of this water is highly doubtful and has not been adequately evaluated"); OSM-021850–021852 (report of professional geologist Michael Meredith concluding that Signal Peak's groundwater model "does not establish the Deep Underburden [deep aquifer] as a viable replacement water source"); OSM-001232, -001246 (1990 report by Dr. Richard Parizek explaining that "[t]here is little margin for error" because "[t]he quantities of water available are limited to start within this semiarid region and annual recharge rates are indeed limited" and "[s]ubsidence related changes in groundwater flow will not be very forgiving").

[13] *E.g.*, OSM-025688 (quoting letter from Signal Peak CEO Parker Phipps to rancher, stating that "mitigating" impacts to water is "inconvenient" and "unsustainable" for coal company (*see also* Doc. 1-1 (Phipps Letter)); OSM-005856 (Signal Peak's prior groundwater model by consultant Michael Nicklin, Ph.D., expressing uncertainty that deep aquifer could supply mitigation water and finding that replacement water needs "could substantially exceed 100 gpm" and identifying obstacles to using deep aquifer); OSM-025789–025790 (transcript of Dr. Nicklin, testifying that available evidence does not show that the deep aquifer can supply greater than 100 gpm of replacement water).

Despite overwhelming evidence—including the analysis and quantitative modeling by Dr. Gardner showing mitigation was "very unlikely," with which agency experts largely concurred—Federal Defendants failed entirely to address, discuss, or respond to Dr. Gardner's report. Instead, the agency accepted Signal Peak's analysis without noting any of its many flaws and, parroting Signal Peak's unsupported assertions, stated repeatedly that the mine's impacts to springs and groundwater (which could be "significant" and "long term") "would be mitigated" with water from the deep aquifer. OSM-031016 (identifying deep aquifer ("UB2A") as proposed "source of mitigation water for mining impacts"), -031025 (stating that impacts to stock ponds "would be mitigated" to replace "water supplies for livestock and wildlife"), -031030–031031 (springs may be impacted or dewatered by mining causing "significant" or "permanent" loss of water "but would be mitigated" including by replacement of water supplies), -031061–031062 (noting springs may be dewatered but are "expected to be … mitigated, with minimal risks to nearby communities and livestock").

Federal Defendants' error is analogous to—but far more egregious than—that identified by this Court in *Montana Environmental Information Center v. Haaland*, No. CV 19-130, 2022 WL 2466794, *10 (D. Mont. Feb. 11, 2022). In *Haaland*, public comments notified the agency of potential cumulative impacts to water from a proposed mine expansion and water withdrawals from an adjacent

power plant that would burn the coal. *Id.* Agency staff recognized the water withdrawals as a foreseeable cumulative impact and stated that they could omit the impacts "as long as a good rationale can be provided." *Id.* However, when the agency issued its final environmental impact statement it omitted analysis of the foreseeable impacts "without any rationale," which was arbitrary and capricious. *Id.* at *10–11.

So too here. Despite agency experts agreeing with many of Dr. Gardner's critiques of Signal Peak's analysis and recognizing the "need to evaluate this [Dr. Gardner's] comment seriously," OSM-025877–025880, the agency's rushed FEIS failed entirely to address, discuss, or respond to Dr. Gardner's report. *See* OSM-030653–031345; *accord W. Watersheds Project*, 632 F.3d at 492–93 (reversing agency analysis that "gave short shrift to a deluge of concerns from its own experts"); *Ctr. for Biological Diversity*, 900 F.3d at 1068–69 (reversing agency finding that "did not mention" or discuss aspects of study that "contradicted the data on which [the federal agency] relied"); *Ohio*, 603 U.S. at 295 (finding agency likely acted unlawfully when it "did not address" but "sidestep[ped]" concerns raised by commenters).

As in *Haaland*, *Western Watersheds Project*, *Center for Biological Diversity*, and *Ohio*, Federal Defendants' failure to address, discuss, or respond to

expert concerns—including those of its own experts—was arbitrary and capricious. 5 U.S.C. § 706(2)(a).

The consequences of this failure cannot be overstated: for decades the residents and ranchers of the Bull Mountains, along with experts and regulators, have questioned whether Signal Peak could replace water supplies damaged or dewatered by its subsidence mining. In 2024, Dr. Gardner's study provided the "receipts"—quantitative modeling based on Signal Peak's own data—showing that such mitigation is "very unlikely" and that Signal Peak cannot mitigate even 1% of the water it is *currently* draining from the Bull Mountains. OSM-025880–81. Federal Defendants, in their haste to approve the supposed "emergency" mine expansion, ignored these "receipts," which was unlawful and prejudicial.

## V. This Court Should Vacate Federal Defendants' Unlawful Approval of the Mine Expansion.

Vacatur is the "presumptive remedy" for violations of NEPA and the APA. *350 Montana*, 50 F.4th at 1259 (citing 5 U.S.C. § 706 ("The reviewing court shall … hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law")). Courts have discretion to remand without vacatur, but only in "limited circumstances," where equity so demands, in light of the "seriousness of the agency's errors" weighed "against the disruptive consequences of an interim

change that may itself be changed." *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) (citation omitted).

### A. Federal Defendants' errors—cutting out the public and ignoring the science—were serious.

Here, the agencies' errors are grave. Their approval of the AM3 expansion sidestepped fundamental NEPA and APA public participation requirements based on a fabricated crisis with no basis in reality and no nexus to the agencies' own regulatory criteria for emergencies warranting expedited NEPA review. *Cf.* 43 C.F.R. § 46.150. This directly frustrates NEPA's goals of ensuring "responsible opposing viewpoints to be included in the final EIS," *California v. Block*, 690 F.2d 753, 770–71 (9th Cir. 1982) (citations omitted), and promoting "deliberative decision-making that takes into account informed public comments," *Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1, 39 (9th Cir. 2025). In other words, the government's decision to eliminate meaningful public participation "is in direct tension with NEPA." *Id.* Indeed, unlawfully abandoning public participation in government decision-making—a core democratic norm—"is a fundamental flaw that 'normally' requires vacatur of the rule." *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 199 (D.C. Cir. 2009) (citation omitted).

In addition to these structural flaws, it is unlikely that, if the Federal Defendants repair their flaws, they would again be able to justify approval of the mine expansion on remand. *See 350 Montana*, 2023 WL 1927307 at *2 (applying

standard). As noted, independent and leading scientists—including Dr. Parizek, Mr. Kirk, and Dr. Gardner—have been warning agency decisionmakers for more than three decades that this mine would irreversibly harm the ecology and ranching community of the Bull Mountains. (Doc. 1-2 at 2–3); OSM-001241; OSM-027498; *see also supra* nn. 10–13 (accounts of mine's irreversible harm to water). Agency scientists have long agreed and urged disapproval. Hedges Decl., Ex. A at 1–26; OSM-025877–82.

Yet, agency leadership has repeatedly refused to heed the science. They ignored Dr. Parizek's report. OSM-021050. They "lost" Mr. Kirk's groundwater model. (Doc. 1-2 at 2–3.) And they ignored Dr. Gardner's report, even though their own scientists largely agreed with his findings. *See supra* Argument Part IV. As this Court found in *350 Montana*, 2023 WL 1927307 at *3, these "errors cast substantial doubt on the agency's decision to approve the Mine Expansion in the first instance," demonstrating seriousness and warranting vacatur.

**B. There are no disruptive consequences that would justify an equitable exception to the presumptive remedy of vacatur.**

There are few if any "disruptive consequences" to vacatur to Federal Defendants. *Pollinator Stewardship Council*, 806 F.3d at 532 (citation omitted). Indeed, "the disruption to the agency of vacating its unlawful decision is minimal," *Ctr. for Biological Diversity v. USFS*, No. 24-CV-930, 2026 WL 2287946, *25 (D. Or. Aug. 9, 2026), especially where—as here—there is "real risk of ecological

disruption" from the agencies' failure to consider irreversible hydrogeological impacts, *Cascadia Wildlands v. BLM*, No. 24-CV-1641, 2026 WL 1998555, *4 (D. Or. July 9, 2026).

On the other hand, as this Court previously found, continuing Signal Peak's unlawful subsidence mining "may have impacts on the local community." *350 Montana*, 2023 WL 1927307 at *5. Signal Peak's mining has harmed ranchers' water supplies. *Id.* As a result, one rancher was forced to "liquidate most of [his] cattle herd." OSM-021019. Signal Peak has canceled ranchers' leases to avoid replacing water supplies and repairing subsidence damage. (Doc. 1-1 at 5 (stating that mining "is not compatible with cattle grazing" and mitigating subsidence impacts is "unsustainable").) Signal Peak has told ranchers that it does "not have to do the right thing" and can use its economic might to "take [ranches] over for nothing." OSM-021789. "[O]ne who seeks equity must do equity." *Donaldson Bros. v. Phila. Ins. Co.*, No. CV 06-139, 2008 WL 11349981, *5 (D. Mont. May 14, 2006) (quoting *Kauffman-Harmon v. Kauffman*, 2001 MT 238, 36 P.2d 408, 411). Having failed to treat residents of the Bull Mountains with equity, Signal Peak cannot now seek an equitable exception to vacatur.

Meanwhile, continued export of United States coal from the Bull Mountains to the open market—including sending a significant quantity of coal to supposed geopolitical adversary China (Hong Kong), OSM-030753—is inconsistent both

with the alleged domestic energy emergency[14] and the Federal Defendants' purported goal of "deterring aggression by China." OSM-030707. Indeed, the U.S. Department of Treasury has recently characterized Signal Peak's one-third owner, Gunvor Group, as the "Kremlin[']s puppet" that "will never get a license to operate or profit" from fossil fuel resources, as long as Russia's war against Ukraine continues. (Doc. 1, ¶ 73.) Under this reasoning, vacatur is more likely to further the United States' geopolitical priorities than harm them.

Because the Federal Defendants have again refused to provide the transparency and accountability federal law demands and have refused to follow the science, their approval of the mine expansion should again be vacated. *350 Montana*, 2023 WL 1927307 at *5–6.

## CONCLUSION

The Conservation Groups respectfully request that this Court grant them summary judgment and vacate approval of the mine expansion.

Dated, October 9, 2026.

/s/ Shiloh Hernandez
Shiloh Hernandez
Earthjustice
P.O. Box 4743
Bozeman, MT 59772-4743
(406) 586-9699
shernandez@earthjustice.org

[14] Coal exports increase domestic coal prices. OSM-014708.

/s/ Daniel Timmons
Daniel Timmons, *pro hac vice*
Western Environmental Law Center
409 E. Palace Ave. #2
Santa Fe, NM 87501
(505) 570-7014
timmons@westernlaw.org

/s/ Melissa Hornbein
Melissa Hornbein
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
(406) 443-3501
hornbein@westernlaw.org

/s/ Brandon Jones-Cobb
Brandon Jones-Cobb, *pro hac vice*
Center for Biological Diversity
P.O. Box 30604
Seattle, WA 98113-0604
(564) 397-0830, ext. 478
bjonescobb@biologicaldiversity.org

*Attorneys for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

Consistent with Local Rule 7.1(d)(2)(E), I hereby certify that the foregoing brief contains 8,757 words, excluding caption, certificate of compliance, table of contents and authorities, exhibit index, signature blocks, and any certificate of service. I relied on the word count function of the word-processing system used to prepare this brief.

/s/ Shiloh Hernandez
Shiloh Hernandez